# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| READY FOR RON<br>66 W. Flagler Street<br>Suite 900, #6781<br>Miami, FL 33130,<br><br>*Plaintiff*,<br><br>v.<br><br>FEDERAL ELECTION COMMISSION<br>1050 First Street, NE<br>Washington, DC 20463,<br><br>*Defendant*. | Judge Randolph D. Moss<br><br>No. 1:22-cv-3282-RDM |

# PLAINTIFF READY FOR RON'S
# POST-ARGUMENT SUPPLEMENTAL BRIEF

Dan Backer, Esq. (D.C. Bar No. 996641)
Chalmers, Adams, Backer & Kaufman LLC
441 N. Lee Street, Suite 300
Alexandria, VA 22314
(202) 210-5431
dbacker@ChalmersAdams.com

Lilian Rodriguez-Baz, Esq.*
Chief Legal Counsel, Ready for Ron
66 W Flagler Street, Suite 900
Miami, FL 33130
(561) 291-9897
Lilian@ReadyForRon.com

*Admitted pro hac vice
*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................iii

ARGUMENT ....................................................................................................... 1

I.     THIS COURT SHOULD NOT TREAT THE PETITION AS A
       "CONTRIBUTION" UNDER THE FEDERAL ELECTION CAMPAIGN ACT.......... 3

      A.    *The FEC's Explanation as to Why the Signed Petition Qualifies
            as a "Contribution" from RFR Does Not Survive Serious Consideration* ........... 4

          1.    RFR's independent expenditures to solicit signatures for its
                 Petition are not contributions to Governor DeSantis, and do not
                 cause any of the signatures it gathers to be deemed contributions ........... 4

          2.    Each signatory's submission of their name and contact
                 information to RFR to incorporate into the petition and transmit
                 to Governor DeSantis should not be regarded as a contribution .............. 7

          3.    The aggregation of signatories' contact information incorporated
                 into the petition does not somehow give rise to a contribution .............. 11

      B.    *The FEC Admits the Term "Contribution" is Ambiguous.
            This Court Should Not Strain to Construe the Term Broadly
            to Include RFR's Signed Political Petition* .......................................................... 14

II.    THE FIRST AMENDMENT BARS THE FEC FROM APPLYING THE
      FECA'S CONTRIBUTION LIMITS TO PROHIBIT RFR FROM PROVIDING
      ITS SIGNED POLITICAL PETITION TO GOVERNOR DESANTIS ........................ 17

      A.    *The Signatories' Contact Information is an Integral Part of the
            Petition's Expressive Content and the Means Through Which the
            Signatories Associate with Each Other and Governor DeSantis* ........................ 18

      B.    *The FEC's Prohibition on RFR Providing Its Signed
            Political Petition to Governor DeSantis is a Content-
            Based Prohibition Triggering Strict Scrutiny* ...................................................... 22

      C.    *RFR's Signed Petition Would Be a Wasteful, Overpriced, Time-
            Consuming, and Ridiculously Inefficient Way of Attempting to
            Circumvent Contribution Limits and Engage in* Quid Pro Quo *Corruption* ....... 24

      D.    *The FEC's Arguments Undermine Its Asserted
            Anti-Corruption and Anti-Circumvention Interests* ........................................... 26

E.      *The Supreme Court's Reasoning Upholding the Constitutionality of Contribution Limits is Inapplicable to a Signed Political Petition*......................27

III.   AT THE VERY LEAST, THE CONTACT INFORMATION INCORPORATED INTO THE PETITION SHOULD BE DEEMED CONDUIT CONTRIBUTIONS FROM EACH SIGNATORY. ACCEPTING THE PETITION WOULD NOT AUTOMATICALLY TRIGGER "CANDIDATE" STATUS FOR GOVERNOR DESANTIS........................28

CONCLUSION..................................................................................................................32

NOTICE OF ERRATA....................................................................................................33

## <u>TABLE OF AUTHORITIES</u>

<u>*Cases*</u>

*AFL-CIO v. FEC,*
    333 F.3d 168 (D.C. Cir. 2003) ....................................................................... 15

*Ams. for Prosperity Found. v. Bonta,*
    141 S. Ct. 2373 (2021) .......................................................................... 26, 30

*Barr v. Am. Ass'n of Political Consultants,*
    140 S. Ct. 2335 (2020) ................................................................................. 22

*Brayshaw v. City of Tallahassee,*
    709 F. Supp. 2d 1244 (N.D. Fla. 2010) ........................................................ 19

*Brown v. Entertainment Merchants Ass'n,*
    564 U.S. 786 (2011) ..................................................................................... 24

*Brown v. Glines,*
    444 U.S. 348 (1980) ............................................................................... 17, 28

*Buckley v. Valeo,*
    424 U.S. 1 (1976) (per curiam) ............................................................*passim*

*Chamber of Commerce v. FEC,*
    69 F.3d 600 (D.C. Cir. 1995) ....................................................................... 15

*Citizens Against Rent Cont./Coalition for Fair Hous. v. Berkeley,*
    454 U.S. 290 (1981) ................................................................................. 1, 17

*City of Austin v. Reagan Nat'l Adver. of Austin, LLC,*
    142 S. Ct. 1464 (2022) ................................................................................. 23

*Cox v. Louisiana,*
    379 U.S. 559 (1965) ..................................................................................... 17

*DePierre v. United States,*
    564 U.S. 70 (2011) ....................................................................................... 15

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ....................................................................................... 2

*FEC v. Akins,*
    524 U.S. 11 (1998) ....................................................................................... 21

*FEC v. GOPAC, Inc.*,
    917 F. Supp. 851 (D.D.C. 1996) ...................................................................... 15

*FEC v. Machinists Non-Partisan Political League*,
    655 F.2d 380 (D.C. Cir. 1981) ................................................................. 15, 16

*FEC v. Nat'l Conservative Political Action Comm.*,
    470 U.S. 480 (1985) ..................................................................................... 5, 6

*FEC v. Sailors' Union of Pac. Political Fund*,
    624 F. Supp. 492 (N.D. Cal. 1986) ............................................................... 15

*FEC v. Sailors' Union of Pac. Political Fund*,
    828 F.2d 502 (9th Cir. 1987) ........................................................................ 16

*Lamont v. Postmaster General*,
    381 U.S. 301 (1965) ................................................................................... 2, 21

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004) .......................................................................................... 15

*McCutcheon v. FEC*,
    572 U.S. 185 (2014) ................................................................................... 3, 25

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995) ................................................................................... 2, 21

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) ...................................................................................... 30

*Org. for a Better Austin v. Keefe*,
    402 U.S. 415 (1971) ...................................................................................... 20

*Ostergren v. Cuccinelli*,
    615 F.3d 263 (4th Cir. 2010) ................................................................... 19, 20

*Publius v. Boyer-Vine*,
    237 F. Supp. 3d 997 (E.D. Cal. 2017) ........................................................... 20

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ...................................................................................... 23

*Richmond Co. v. United States*,
    275 U.S. 331 (1928) ...................................................................................... 15

*Roberts v. U.S. Jaycees,*
    469 U.S. 609 (1984) ................................................................................. 21

*Sec'y of State of Md. v. Joseph H. Munson Co.,*
    467 U.S. 947 (1984) ................................................................................. 30

*Sheehan v. Gregoire,*
    272 F. Supp. 2d 1135 (W.D. Wash. 2003) .............................................. 19

*Shuttlesworth v. City of Birmingham,*
    394 U.S. 147 (1969) ................................................................................. 10

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.,*
    502 U.S. 105 (1991) .............................................................................22-23

*United States v. Congress of Indus. Orgs.,*
    335 U.S. 106 (1948) ................................................................................. 21

*W. Va. v. EPA,*
    142 S. Ct. 2587 (2022) ............................................................................. 15

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton,*
    536 U.S. 150 (2002) ................................................................................. 24


<u>Statutes and Regulations</u>

11 C.F.R. § 100.12 ........................................................................................ 19

11 C.F.R. § 100.52 .......................................................................................... 4

11 C.F.R. § 100.72 ........................................................................................ 32

11 C.F.R. § 102.8 .................................................................................. *passim*

11 C.F.R. § 104.3 ........................................................................................ 30

11 C.F.R. § 110.1 ........................................................................................ 10

11 C.F.R. § 110.6 .................................................................................. *passim*

52 U.S.C. § 30101 ................................................................................ *passim*

52 U.S.C. § 30116 ................................................................................ *passim*

52 U.S.C. § 30118 .......................................................................................... 7

*FEC Issuances*

*ActBlue*, A.O. 2006-30 (Nov. 9, 2006) ....................................................................... 6, 9, 29, 30

*ActBlue*, A.O. 2007-27 (Dec. 17, 2007) ................................................................................... 9

*ActBlue*, A.O. 2014-19 (Jan. 15, 2015) ................................................................... 6, 29-30, 33

*Associated Builders and Contractors, Inc.*, A.O. 1984-23 (June 22, 1984) ................................ 7

*Brunswick Corp.*, A.O. 1984-43 (Sept. 14, 1984) ............................................................... 7, 17

FEC, *Legislative Recommendations*—1987, *reprinted in* House Subcomm.
on Elections, Comm. on House Admin., *Hearings on Campaign Finance*,
100th Cong. 1st Sess. (May 21, June 2, June 16, June 30, and July 14, 1987); ........................ 16

FEC, *Price Index Adjustments for Contribution and Expenditure
Limitations and Lobbying Bundling Disclosure Threshold*,
88 Fed. Reg. 7088 (Feb. 2, 2023) ......................................................................................... 31

FEC, *Priority Legislative Recommendations* (2001),
https://www.fec.gov/resources/cms-content/documents/legrec2001.pdf .................................. 16

*Hon. Cecil Heftel*, A.O. 1977-51 (Nov. 16, 1977) ............................................................... 7, 30

*Skimmerhat*, FEC A.O. 2012-22 (Aug. 2, 2012) ..................................................................... 9

Statement of Reasons of Vice Chair Allen Dickerson and
Commissioners Sean J. Cooksey and James E. "Trey" Trainor, III,
*In re Joaquin Castro*, MUR 7635 (Dec. 3, 2021) ................................................................... 27

*WE LEAD*, A.O. 2003-23 (Nov. 7, 2003). ..................................................................*passim*


*Assorted Other Sources and Authorities*

D.C. L. Cv. R. 5.1 ............................................................................................................... 19

Fed. R. Civ. P. 26 ............................................................................................................... 19

Emily Hall, *Romney Fundraising Organization:
"C. Moore Bacon" is Real Deal*,
WASH. POST (Sept. 18, 2013),
https://www.washingtonpost.com/blogs/in-the-loop/wp/2013/09/18/ romney-fundraising-
organization-c-moore-bacon-is-real-deal/ ............................................................................ 20

https://www.adamschiff.com/ ....................................................................................... 8

https://katieporter.com/ ............................................................................................. 8

https://nikkihaley.com/home/ ................................................................................... 8

www.readyforron.com ............................................................................................. 13

**ARGUMENT**

If an individual wrote to Governor DeSantis to encourage him to run for President, neither the First Amendment nor FECA would empower the FEC to prohibit it.

If that same individual encouraged a crowd of people to individually write letters to Governor DeSantis containing their contact information to encourage him to run for President, neither the First Amendment nor FECA would empower the FEC to prohibit it.

If that individual – or in this case RFR - spent millions of dollars persuading millions of people throughout the nation to each download an identical letter – from RFR's website - encouraging Governor DeSantis to run for President, fill it out with their name and signature, and mail it to hm, neither the First Amendment nor FECA would empower the FEC to prohibit it.

Yet because RFR has instead encouraged people to engage in "collective action" by joining together in a single petition to ensure their voices are not "faint or lost," *Citizens Against Rent Cont./Coalition for Fair Hous. v. Berkeley*, 454 U.S. 290, 294 (1981), the FEC claims authority to quash the political expression and association of both RFR and the petition's signatories. Neither the First Amendment nor FECA allows such an unreasonable result.

The FEC argues RFR and the petition's signatories may send their petition to Governor DeSantis only if it is effectively anonymous—omitting the signatories' contact information. *See* Transcript of Motion Hearing at 38 (Feb. 28, 2023) (hereinafter, "Tr.") (arguing RFR should be permitted to include "just a list of names without contact information" with its petition). In the FEC's view, RFR may transmit the petition only if it is impossible for Governor DeSantis to determine who actually associated together to join the petition (i.e., "John Smith," without any further information, is completely uninformative); confirm the signatures' authenticity; and, most importantly, ***respond*** to the signatories and engage in political dialogue with them. Political speech

should not be, and need not be, a one-way street. *See Lamont v. Postmaster General*, 381 U.S. 301, 305-06 (1965) (stating the First Amendment protects the right to both make and receive communications). Neither the FECA nor the First Amendment allow the Government to require speakers to remain effectively anonymous as a condition for engaging in speech—particularly political communications. *Cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995) (suggesting people engaged in political expression have a First Amendment to decide for themselves whether to remain anonymous).

The power of a petition comes precisely from the collective action it embodies. *District of Columbia v. Heller*, 554 U.S. 570, 645 (2008) (Stevens, J., dissenting) ("[I]f they are to be effective, petitions must involve groups of individuals acting in concert."). By signing the petition, the signatories expressly requested that their names and contact information be added, aggregated, and transmitted to Governor DeSantis. Declaration of Gabriel Llanes, ¶¶ 14-17 [hereinafter, "Llanes Decl."]. Those signatories wish to associate together meaningfully, fully identify themselves to Governor DeSantis, and facilitate return communications by him. FECA does not authorize, and the First Amendment does not tolerate, a prohibition on such political expression and interaction.

In addition, compiling a political petition would be a ridiculously poor, extravagantly wasteful, inefficient, and time-consuming method of attempting to circumvent contribution limits. *See infra* Section II.D. As discussed later, the gaping disparity between RFR's solicitation costs (approaching $1 million) and the estimated market value of the petition's signatures (based on the evidence in the record, currently as little as $13,000); the time it has taken RFR to amass those signatures (nearly a year); and the inherent risk of being unable to identify or generate sufficient public support makes petition-gathering incredibly unrealistic as a potential backdoor method of

smuggling excessive campaign contributions to a candidate or potential candidate. *See McCutcheon v. FEC*, 572 U.S. 185, 213-14 (2014) (invalidating aggregate contribution limits in part because "no rational actor" would contribute a tremendous amount of money to scores of political committees in order to ultimately funnel $26,000 in contributions to a candidate).

As this Memorandum summarizes, in light of the oral arguments this Court held, RFR's petition should not be regarded as a "contribution." In the event this Court concludes the petition *is* a contribution due to the signatory contact information it contains, it should be regarded as a conduit contribution from each signatory to Governor DeSantis. Attempting to shoehorn the petition into FECA's contribution framework in this manner, however, leads to a range of bizarre results which simply underscores the statute's inapplicability here. And the First Amendment bars the FEC from wielding FECA to either prohibit RFR from providing its signed petition to Governor DeSantis, or require RFR to modify its speech, effectively anonymize the petition's signatories, undermine their efforts to associate with Governor DeSantis, and make it impossible for him to respond to them by stripping their contact information.

RFR's petition isn't a sham. It isn't a way to smuggle a mailing list to Governor DeSantis. It *is* a legitimate and potentially powerful form of political expression and association, which the U.S. Constitution protects from the reach of overzealous regulatory agencies.

## I.      THIS COURT SHOULD NOT TREAT THE PETITION AS A "CONTRIBUTION" UNDER THE FEDERAL ELECTION CAMPAIGN ACT

RFR's petition incorporates the names and contact information of the petition's signatories as part of their respective signature blocks at the express request and direction of each individual signatory. This Court should decline to consider the signed petition incorporating signatories'

contact information to be a "contribution" under 52 U.S.C. § 30101(8)(A)(i) and 11 C.F.R. § 100.52(a), (d).

**A.     *The FEC's Explanation as to Why the Signed Petition Qualifies as a "Contribution" from RFR Does Not Survive Serious Consideration***

The FEC argues the petition should be treated as a contribution from RFR to Governor DeSantis because it is simply a mailing list in disguise. *See* Transcript of Motion Hearing at 31 (Feb. 28, 2023) (hereinafter, "Tr."). Putting aside the severe constitutional problems with this argument, *see infra* Part III, the FEC is playing too fast and loose with the law. There are three possible answers as to what constitutes the purported "contribution" in this case. None is correct.

**1.     RFR's independent expenditures to solicit signatures for its Petition are not contributions to Governor DeSantis, and do not cause any of the signatures it gathers to be deemed contributions.**

*First*, this Court might conclude RFR's extensive expenditures on advertisements, solicitations, and other aspects of its petition-gathering process constitute a "contribution" to Governor DeSantis. The FEC claimed at oral argument the petition should be deemed a contribution "specifically because of the money and other labor invested by Ready for Ron." Tr. at 32. Such a remarkable conclusion would run flatly afoul of *Buckley v. Valeo*'s fundamental distinction between "contributions," which are provided to candidates, and "independent expenditures," which are spending decisions regarding political speech and other election-related activities over which candidates lack any influence, input, or control. 424 U.S. 1, 44-45, 47 (1976) (per curiam) (explaining why expenditures are entitled to greater constitutional protection than contributions). RFR's spending decisions have been made completely independently of Governor DeSantis—who, in any event, is not even presently a presidential candidate. And none of the funds RFR spent was provided to Governor DeSantis. Accordingly, the money RFR has spent to solicit

4

petition signatures cannot be deemed a contribution to Governor DeSantis. *See WE LEAD*, A.O. 2003-23, at 5 (Nov. 7, 2003).

The FEC's advisory opinion in *WE LEAD* confirms this conclusion. In *WE LEAD*, a political committee solicited contributions which it would provide to the Democratic Party's eventual nominee for President, who had not yet been identified. *Id*. at 1. The Commission considered whether the committee's "direct costs of solicitation should be treated as in-kind contributions or independent expenditures." *Id*. The Commission concluded if the conduit committee's "solicitations in this earmarking program were made independent of any candidate . . . by virtue of this independence the direct costs of solicitation incurred by [the committee] would constitute independent expenditures." *Id*. The Commission went so far as to reverse an earlier advisory opinion which had treated a political committee's costs of soliciting contributions to a candidate as "an in-kind contribution to the candidate's campaign merely on account of a candidate's subsequent acceptance of earmarked contributions." *Id*. (overruling A.O. 1980-46); *see also FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 496 (1985) (invalidating limits on independent expenditures by PACs because such expenditures "are entitled to full First Amendment protection").

Moreover, the fact the political committee made such expenditures to solicit conduit contributions from the public to a candidate neither undermined the legal status of the resulting conduit contributions, nor allowed the Commission to treat those conduit contributions as originating from the committee itself. *See id*. at 3 (recognizing a conduit contribution from a person, through a conduit committee, to a candidate, is a contribution from that person to the candidate (citing 52 U.S.C. § 30116(a)(8); 11 C.F.R. § 110.6(a)).

The FEC made a desultory attempt to distinguish *WE LEAD* during oral argument based on a legally irrelevant criterion its own advisory opinions have rejected. Tr. at 32. The Commission argued *WE LEAD* is inapplicable because that opinion involved conduit contributions to the Democratic Party's eventual nominee, who had not yet been identified, rather than to a designated person (i.e., Governor DeSantis) who had not yet become a candidate. *Id*. Nothing in *WE LEAD*'s reasoning, however, suggested that the conduit committee was permitted to make unlimited expenditures only because the candidate for whom it was soliciting and collecting contributions had not yet been named. *See* A.O. 2003-23, at 5 ("If WE LEAD's solicitations in this earmarking program were made independent of any candidate . . . by virtue of this independence the direct costs of solicitation incurred by WE LEAD would constitute independent expenditures"). To the contrary, that conduit committee—like RFR itself—had a fundamental constitutional right to make unlimited independent expenditures. *See Nat'l Conservative Political Action Comm.*, 470 U.S. at 496.

And as the FEC is well aware, however, its own advisory opinions apply the exact same legal analysis to conduit committees regardless of whether they solicit and collect funds on behalf of a nominee to be identified in the future, or instead on behalf of a designated person (such as Governor DeSantis) who has not yet become a candidate. *Compare ActBlue*, A.O. 2014-19 (Jan. 15, 2015) (approving establishing of conduit fund to be provided to the eventual nominee if that person is female), *with ActBlue*, A.O. 2006-30, at 4-5 (Nov. 9, 2006) (approving establishing of a conduit fund to be provided to a specifically identified prospective candidate in the event that person decides to run for office). Thus, contrary to the FEC's surprising protestations, *WE LEAD* is squarely on point.

Accordingly, RFR's petition-related spending neither constitute a contribution to Governor DeSantis nor allow its petition to be deemed a contribution from RFR to him.

> **2.   Each signatory's submission of their name and contact information to RFR to incorporate into the petition and transmit to Governor DeSantis should not be regarded as a contribution.**

***Second***, this Court might instead conclude each signatory's provision of their own contact information to RFR to include within the petition and transmit to Governor DeSantis constitutes a conduit contribution from that signatory to the Governor. *See* Tr. at 45 ("[E]ach one of these individual pieces of contact information actually is valuable . . . ."). As discussed later, ***if*** this Court concludes the information contained within the petition constitutes a "contribution," then this Court should treat it as a series of conduit contributions in this manner. *See infra* Part III. But even this framing is ultimately incorrect. Notwithstanding the language of the Federal Election Campaign Act ("FECA"), the FEC has not historically treated every single thing of value as a "contribution," particularly where the "thing" at issue involved political expression.

The FECA defines "contribution" as "any gift . . . of money or anything of value made . . . for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i). Despite that seemingly sweeping definition, the FEC has not treated endorsements of candidates as "contributions," regardless of how valuable they may be. The FECA generally prohibits corporations from making contributions to federal candidates. 52 U.S.C. § 30118(a). In *Associated Builders and Contractors, Inc.*, A.O. 1984-23, at 2 (June 22, 1984), however, the Commission nevertheless concluded "a corporation or labor organization may endorse a candidate . . . ." *See also Brunswick Corp.*, A.O. 1984-43, at 2 (Sept. 14, 1984) ("[E]ndorsement of a candidate by a corporation does not by itself constitute a prohibited contribution . . . ."). Likewise, in *Hon. Cecil Heftel*, A.O. 1977-51, at 2 (Nov. 16, 1977), the Commission concluded a Member of Congress'

"receipt of macadamia nuts from corporations, trade associations, [or] individuals" does not constitute a "contribution," in part because they "appear to be of minimal value." An individual's name and contact information is not of greater value than a box of macadamia nuts.

Moreover, the FEC has not historically treated a person's provision of their own contact information directly to a candidate as a "contribution." Virtually every federal candidate's webpage has an online form inviting people to submit their names and various pieces of contact information such as e-mail addresses, telephone numbers, *see, e.g.*, https://nikkihaley.com/home/; zip codes, *see, e.g.*, https://katieporter.com/; https://www.adamschiff.com/; and other such information. No one thinks they are making a political contribution when they submit their name and contact information through such forms. The FEC can point to no previous advisory opinion, enforcement matter, or case in which the Commission has regarded an individual's voluntary provision of their contact information to a candidate, political party, or political committee as a contribution—even if the recipient aggregates that information into a list with potential market value. The FEC has never counted a person's provision of such contact information to a candidate against that person's contribution limit. And the FEC cannot transmute a person's provision of their own contact information into a contribution simply because that person chooses to band together with a potential candidate's other supporters to transmit their contact information collectively through a conduit draft committee's petition. *Cf.* 52 U.S.C. § 30116(a)(8).

In other words, designation of something as a "contribution" cannot hinge on whether a person provides that underlying "thing" directly to a candidate, or instead provides it indirectly through a conduit committee. If a person's provision of their name and contact information to a conduit committee to transmit to a candidate constitutes a "contribution" to that candidate, then that person's provision of the same information directly to the candidate must likewise be deemed

a "contribution" to that candidate (who may have spent even more money than RFR soliciting such support). No one seriously believes the latter scenario involves a "contribution." Accordingly, a contribution similarly cannot arise simply because a person transmits their contact information through a conduit committee such as RFR to a candidate or potential candidate.

ActBlue and WinRed are the large conduit committees at the heart of our political system. Together they have processed billions of dollars in monetary conduit contributions from millions of people to candidates, political parties, and other entities. For decades, ActBlue and WinRed have openly, notoriously, and systematically solicited, collected, and compiled phone numbers and e-mail addresses from contributors on a national scale to provide to their respective recipient candidates and political parties. *See* ActBlue, *Does ActBlue Share My Personal Information, Including Email Address and Phone Number?* ("We also pass along your e-mail address, as well as your phone number if you choose to provide it, to the group you gave to—and no one else—so they can stay in touch."), https://support.actblue.com/donors/about-actblue/does-actblue-share-my-personal-information-including-email-address-and-phone-number/; WinRed, *Privacy Policy—Your Privacy Rights* (July 13, 2020), https://winred.com/privacy/.

These platforms have done so with the FEC's knowledge and apparent permission, or at least intentional acquiescence. *See ActBlue*, FEC A.O. 2006-30, at 6-7; *see also Skimmerhat*, FEC A.O. 2012-22, at 3, 5 (Aug. 2, 2012); *ActBlue*, A.O. 2007-27, at 7 (Dec. 17, 2007). The FECA does not distinguish among different types of unauthorized conduit committees; a single statutory provision and regulation apply equally to all of them. *See* 52 U.S.C. § 30116(a)(8); 11 C.F.R. § 110.6. RFR should not be subject to greater legal restrictions on its ability to convey contact information from members of the public to a candidate or potential candidate, simply because it

solicited their signatures rather than asking for monetary conduit contributions.[1] Subjecting political organizing to harsher restrictions than monetary fundraising gets campaign finance law exactly backwards.

Finally, treating signatories' provision of their contact information as conduit contributions would make it impossible for RFR or any other entity to actually compile a political petition. FEC regulations require a conduit committee to forward each conduit contribution to the designated recipient within ten days of receipt. 11 C.F.R. § 102.8(a). This provision would require RFR to forward each signatory's name and contact information to Governor DeSantis within ten days of receiving it once be becomes a candidate (and potentially when he begins testing the waters). RFR would be prohibited from gathering a substantial number of signatures over an extended period of time to present to Governor DeSantis as part of an integrated political petition at the time when it may have the greatest impact. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 163 (1969) (Harlan, J., concurring) ("Timing is of the essence in politics."). Rather, RFR would have to

---

[1] FEC regulations governing conduit committees' disclosure obligations further underscore the incoherence of attempting to treat each signatory's contact information within the petition as a "contribution." Had RFR solicited and accepted monetary conduit contributions for Governor DeSantis, it would have been ***legally required*** to solicit, collect, and convey to him the name and address of each person who contributed any funds at all, *see* 11 C.F.R. § 110.6(c)(1)(iii)-(iv)(A), if for no other reason than to ensure the recipient candidate did not accept any contributions from a person that, combined with that person's other contributions to the candidate, violated FECA's contribution limits. *See* Tr. at 41 ("[W]e do require enough information so that we can verify who the [contributor to the conduit committee] is so that they're not making multiple contributions to a single person."); *see also* 11 C.F.R. § 110.1(b)(1) (providing for aggregation of a person's contributions to a candidate to determine if they violate contribution limits). Needless to say, a conduit committee's provision of that legally required identifying information about each contributor to the recipient candidate does not constitute an ***additional*** in-kind contribution to that candidate, either by those original contributors or the conduit committee itself. Thus, the FEC's own regulations do not regard identifying information about a contributor provided to a candidate as a contribution. Though the regulation expressly mentions only names and physical addresses, this regulatory scheme does not suggest different logic would apply to additional, closely related contact information such as a phone number or e-mail address.

repeatedly forward signatories' contact information to Governor DeSantis in drips and drabs on an ongoing basis, turning a potential petition into repeated spam.

For these reasons, an individual's provision of their name and contact information to a candidate, whether directly or indirectly as part of an intermediary committee's political petition, should not be deemed a "contribution."

### 3.    The aggregation of signatories' contact information incorporated into the petition does not somehow give rise to a contribution

So what is left to constitute the alleged "contribution"? RFR's expenditure of funds to solicit signatures is not a contribution and does not cause the signatures it collects to be deemed contributions. *See supra* Subsection I.A.1. Each signatory's provision of their name and contact information to RFR to incorporate into the petition and transmit to Governor DeSantis should not be deemed a contribution. *See supra* Subsection I.A.2. The ***third***, and only remaining, possibility is that the aggregation of signatures in RFR's petition somehow collectively gives rise to an overarching contribution by RFR.

This vague, amorphous "whole is greater than the sum of its parts" logic finds no basis in either First Amendment or campaign finance law. In attempting to defend this position in court, the FEC repeatedly fell back on the notion that the signed petition should be deemed a contribution because RFR spent so much money to collect the signatures and compile it. *See, e.g.*, Tr. at 32 (arguing the signed petition is a contribution "specifically because of the money and other labor invested by Ready for Ron"); *id*. at 36 (arguing, after some verbal dodging, RFR's "using these funds to create a thing of value"); *see also id*. at 13 (reiterating the FEC's argument the signed petition is a contribution from RFR because it is "a project on which RFR plans to expend considerable resources of its own"). As noted earlier, however, when a committee makes independent expenditures to solicit conduit contributions for a candidate, those expenditures are

11

not deemed contributions to that candidate. And they do not cause conduit contributions from the public made in response to those solicitations to instead be deemed contributions from the intermediary committee. *See generally WE LEAD*, A.O. 2003-23, at 4-6 (Nov. 7, 2003).

At oral argument, this Court discussed the FEC's contention the conduit statute is somehow inapplicable because RFR's petition "does not consist solely, or even primarily, of any individual signatory's name or contact information." Tr. at 13.[2] Rather, RFR's petition involves the "collection and compilation of information from tens of thousands, if not millions, of individuals nationwide." *Id*. Far from rendering the conduit provisions inapplicable, this argument simply points out the very nature of conduit contributions. If RFR had solicited and successfully collected one dollar from each of the petition's 225,000 signatories, it would have amassed a total of nearly a quarter million dollars.

RFR aggregation of so many small monetary contributions into a single, large, impressive figure would not affect the underlying nature of those contributions, however. Each transaction would remain a conduit contribution from the person who originally contributed that dollar, through RFR, to Governor DeSantis. The FEC could not conclude RFR had exceeded its contribution limits by forwarding $225,000 in conduit contributions to Governor DeSantis, since RFR would not be deemed the contributor of any of those funds, notwithstanding their aggregation. *See* 11 C.F.R. § 110.6(d)(1) ("A conduit's or intermediary's contribution limits are not affected by the forwarding of an earmarked contribution . . . ."). To the contrary, RFR would be legally obligated to convey all of those funds to him. *See id*. § 102.8(c) (discussing the obligation of intermediaries and conduits to forward earmarked contributions to the designated recipients). And

---

[2] Of course, if RFR's communication to Governor DeSantis contained only a single person's name and contact information, it would be a letter or postcard, not a political petition.

this reasoning does not change even if RFR made substantial expenditures to solicit and collect those funds. *See WE LEAD*, A.O. 2003-23, at 5-6 (Nov. 7, 2003) (recognizing the right of conduit committees to make expenditures without having those expenditures be deemed contributions or change the legal status of the underlying conduit contributions).

The same analysis applies when dealing with in-kind, rather than monetary, conduit contributions. *See* 52 U.S.C. § 30101(8)(A)(i) (defining "contribution" to include both monetary and in-kind contributions). RFR's solicitation, collection, and aggregation of 225,000 signatures with contact information, each worth a small amount of money, does not affect the underlying nature of each of those in-kind contributions. Each transaction remains a conduit contribution from each person who originally signed the petition and provided their contact information, through RFR, to Governor DeSantis. Llanes Decl. ¶¶ 14-17. The FEC may not conclude RFR exceeds its contribution limits by forwarding a petition containing $225,000 worth of signatory contact information to Governor DeSantis, since RFR is not deemed the contributor of any of those individual signatures or accompanying contact information. *See* 11 C.F.R. § 110.6(d)(1). And, again, RFR would be legally obligated to provide the signatories' contact information to Governor DeSantis. *See id*. § 102.8(c).

The FEC's aggregation argument also suffers from another fatal flaw. Imagine that instead of soliciting signatures for a political petition, RFR had spent the same amount of money encouraging people to cut and paste the petition message from its website, *see* www.readyforron.com, and e-mail it together with their name and contact information to Governor DeSantis. RFR might even invite supporters to add a subject line such as "ANOTHER SIGNATURE FOR READY FOR RON'S PETITION!" If RFR's solicitations and advertisements successfully convinced 225,000 people to transmit the requested message and contact information

to Governor DeSantis, the FEC would presumably not contend RFR had somehow made a contribution to Governor DeSantis. And the 225,000 e-mails containing supporters' names and contact information would not transform into a contribution if Governor DeSantis decided to aggregate them together into a single document or file. Thus, particularly in light of the FECA's provisions governing conduit contributions, there is no reasonable basis for concluding the provision of such contact information to Governor DeSantis somehow becomes a contribution simply because RFR allows it to accumulate as part of its petition and provides it to Governor DeSantis at one time, rather than having the Governor accumulate a quarter million identical e-mails from his supporters.

For these reasons, the FEC may not manufacture a "contribution" from RFR simply by aggregating together the value of all the signatory contact information RFR collects.

*          *          *

Since the signed petition containing signatories' contact information cannot be deemed a "contribution" from any perspective, the FECA's contribution limits are inapplicable to it. RFR may therefore provide the signed petition to Governor DeSantis regardless of whether he is testing the waters or has become a candidate.

### B. *The FEC Admits the Term "Contribution" is Ambiguous. This Court Should Not Strain to Construe the Term Broadly to Include RFR's Signed Political Petition*

At the very least, it is far from clear whether the term "contribution" includes contact information embedded within people's signature blocks on a political petition. *See supra* Section I.A.1. The FEC itself has argued the term "contribution" is ambiguous, attempting to use that ambiguity as a springboard from which to claim *Chevron* deference for its broad interpretation. *See* FEC's Opposition to Plaintiff's Motion for Preliminary Injunction, D.E. #16, at 24 (Feb. 1,

2023) [hereinafter, "FEC Opp."]. To the contrary, such ambiguity counsels in favor of a narrower construction. "In this delicate first amendment area, there is no imperative to stretch the statutory language" of the definition of contribution, "or read into it oblique inferences of Congressional intent" to include a signed political petition containing its signatories' contact information. *FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380, 392-94 (D.C. Cir. 1981).[3]

In *Machinists*, the Court construed a broad, ambiguous term ("political committee") narrowly under the constitutional avoidance principle. *Id*. at 394 ("It is our duty in the interpretation of federal statutes to reach a conclusion which will avoid serious doubt of their constitutionality." (quoting *Richmond Co. v. United States*, 275 U.S. 331, 346 (1928))). This doctrine has led the D.C. Circuit to reject the FEC's broad interpretation of other provisions of the FECA, as well. *See, e.g.*, *Chamber of Commerce v. FEC*, 69 F.3d 600 (D.C. Cir. 1995) (invalidating FEC's interpretation of the statutory term "member" in part on constitutional avoidance grounds); *see also AFL-CIO v. FEC*, 333 F.3d 168, 178-80 (D.C. Cir. 2003) (invalidating FEC policy concerning release of evidence obtained in administrative investigations); *FEC v. GOPAC, Inc.*, 917 F. Supp. 851, 861 (D.D.C. 1996) (applying constitutional avoidance canon to reject the FEC's proposed standard for determining whether an entity is a "political committee," and instead mandating "an appropriate 'bright-line' rule"); *FEC v. Sailors' Union of Pac. Political Fund*, 624 F. Supp. 492, 496 (N.D. Cal. 1986) (applying

---

[3] Prohibiting Americans from providing signed political petitions to candidates or potential candidates—or requiring such petitions be effectively anonymous by omitting signatories' names or contact information—would also likely be the sort of important unexpected departure from American political traditions and substantial expansion of agency authority that would trigger the "major questions" doctrine. *W. Va. v. EPA*, 142 S. Ct. 2587, 2614 (2022). And due to the FECA's potential criminal applications, RFR is entitled to have any remaining ambiguity resolved in its favor under the rule of lenity. *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004); *see also DePierre v. United States*, 564 U.S. 70, 88 (2011).

constitutional avoidance canon to "avoid[]" an interpretation of the FECA "under which contributions independently made by voluntarily associated labor organizations are aggregated, thereby severely restricting the exercise of first amendment rights."), *aff'd*, 828 F.2d 502 (9th Cir. 1987).

Here, the FEC seeks to apply the term "contribution" to a signed political petition containing its signatories' contact information. At the very least, such an approach raises serious constitutional questions concerning the First Amendment rights to freedom of expression and association, *see infra* Part II, that this Court can readily construe the FECA to avoid. Moreover, for at least a decade and a half, Congress consistently rejected the FEC's repeated attempts to expand the definition of "contribution" to include funds provided "for the purpose of influencing a clearly identified individual to seek nomination for election or election to Federal office . . . ." *E.g.*, FEC, *Priority Legislative Recommendations*, at 5 (2001), https://www.fec.gov/resources/cms-content/documents/legrec2001.pdf; FEC, *Legislative Recommendations—1987, reprinted in* House Subcomm. on Elections, Comm. on House Admin., *Hearings on Campaign Finance*, 100th Cong. 1st Sess., at 869 (May 21, June 2, June 16, June 30, and July 14, 1987); *see* Plaintiff Ready for Ron's Reply Memorandum of Law in Support of Motion for Preliminary Injunction, at 10-11 n.3. The FEC's interpretation acts as if this rejected language were in the statute. *Machinists* itself cautions against construing FECA broadly to unnecessarily encompass draft efforts. 655 F.3d at 394 (holding attempts to encourage people to become candidates raise no "potential for corruption" that has "been specifically identified by Congress"). In short, there is a range of persuasive reasons why this Court should conclude ambiguities in the definition of "contribution" must be resolved by construing the term narrowly

to exclude signed political petitions. *Cf. Brunswick Corp.*, A.O. 1984-43, at 2 (Sept. 14, 1984) (construing the term "contribution" narrowly to exclude political endorsements).

## II.   THE FIRST AMENDMENT BARS THE FEC FROM APPLYING THE FECA'S CONTRIBUTION LIMITS TO PROHIBIT RFR FROM PROVIDING ITS SIGNED POLITICAL PETITION TO GOVERNOR DESANTIS

This Court should not underestimate the important First Amendment issues that pervade this case. The FEC minimizes RFR's First Amendment claims, claiming its signed political petition involves merely some unspecified "threshold level of expressive activity." Tr. at 39; *see also id*. at 48. To the contrary, the signed petition itself is a literal embodiment of pure written political expression and political association. It contains an explicit political message, *cf. Cox v. Louisiana*, 379 U.S. 559, 563-64 (1965) (declaring a "telegram by a citizen to a public official" is "a pure form of expression"), and specifically identifies each of the people who wished to join together in a "collective effort" to "make their views known," *Citizens Against Rent Cont.*, 454 U.S. at 294.

As Justice Brennan explained:

Petitioning involves a bundle of related First Amendment rights: the right to express ideas, the right to be exposed to ideas expressed by others, . . . and the right to associate with others in the expression of opinion.

The petition is especially suited for the exercise of all these rights: It serves as a vehicle of communication; as a classic means of individual affiliation with ideas or opinions; and as a peaceful yet effective method of amplifying the views of the individual signers. Indeed, the petition is a traditionally favored method of political expression and participation.

*Brown v. Glines*, 444 U.S. 348, 363 (1980) (Brennan, J., dissenting).

The FEC argues RFR may provide its petition to Governor DeSantis only if it fundamentally changes its intended communication by stripping signatories' contact information so the petition does not meaningfully identify them to Governor DeSantis. Tr. at 38; *see also* Tr.

at 40 (arguing the FEC is not barring RFR from conveying its message to Governor DeSantis, as long as it does not provide "contact information" to identify anyone who chose to associate together to join in the message). The FEC has failed to cite even a single case for the proposition that the Government may prohibit people from engaging in political expression unless they are effectively anonymous.

This Part begins by explaining RFR's and the signatories' strong, constitutionally protected interest in including signatories' contact information in the petition. It then shows how applying the FECA in this context is a direct content-based restriction on pure political speech that cannot survive strict scrutiny. Perhaps most importantly, it then goes on to show RFR's signed political petition would be a horrendously wasteful, inefficient, expensive, and unrealistic means of attempting to engage in *quid pro quo* corruption. Next, this Part shows the FEC's asserted interest here does not even rise to the level of "important," much less "compelling." Finally, this Part concludes by briefly reiterating how the Supreme Court's reasoning upholding the constitutionality of contribution limits is inapplicable to a signed political petition.

A.   *The Signatories' Contact Information is an Integral Part of the Petition's Expressive Content and the Means Through Which the <u>Signatories Associate with Each Other and Governor DeSantis</u>*

Both RFR and the petition's signatories have strong First Amendment interests in including their contact information in the signed petition. ***First***, merely including a person's name on its own, such as "John Smith," without any further identifying information, is completely uninformative. Without more, "John Smith" might as well be an "X." It carries no credibility. It completely precludes a signatory from distinguishing him- or herself in any way from potentially millions of other Americans with the same name. If Sylvester Stallone were to sign RFR's petition, he might be easy enough to specifically identify. But many other Americans wouldn't be. During

oral argument, the Court suggested it might not be especially important to Governor DeSantis which particular "Dan Backer" supports him. Tr. at 21. Even if that is correct, it still is meaningful to the signatory himself to be able to fully identify himself as part of his political expression.[4]

**Second**, excluding signatories' contact information from the petition directly bars part of their (and RFR's) political expression by excluding part of the message they wish to convey to Governor DeSantis. By signing the petition, each signatory specifically requested their name and contact information be incorporated into the petition and provided to Governor DeSantis. Courts in other contexts have recognized that, in matters of public concern, the First Amendment protects the right of people to include contact information, such as phone numbers and e-mail addresses, in their political communications. *See, e.g.*, *Brayshaw v. City of Tallahassee*, 709 F. Supp. 2d 1244, 1247, 1249 (N.D. Fla. 2010) (holding a statute prohibiting a person from maliciously disseminating a police officer's home address or telephone number violated the First Amendment); *Sheehan v. Gregoire*, 272 F. Supp. 2d 1135, 1139, 1150 (W.D. Wash. 2003) (holding a statute prohibiting publication of a police officer's address, telephone number, birthday, or social security number "with the intent to harm or intimidate" violated the First Amendment because it prohibited constitutionally protected "pure speech"); *see also Ostergren v. Cuccinelli*, 615 F.3d 263, 271 n.8, 272 (4th Cir. 2010) (holding the First Amendment protects a person's right to post land records containing unredacted social security numbers as a form of political protest, in part because the

---

[4] Even the FEC's definition of the term "identification" embraces not only an individual's name, but also contact and other information further specifying who exactly the person is. 52 U.S.C. § 30101(13)(A); 11 C.F.R. § 100.12. This Court likewise requires attorneys to sign their filings not only with their name, but contact information including an address and telephone number to both help in identifying filers and facilitate communication with them. See D.C. L. Cv. R. 5.1(c)(1); cf. Fed. R. Civ. P. 26(a)(1)(A) (requiring each party to automatically disclose "the name and, if known, the address and telephone number of each individual likely to have discoverable information"). Neither the FEC nor this Court as an institution believes the name "John Smith," alone, is sufficient to meaningfully identify a person.

plaintiff has "freedom to decide how her message should be communicated," and "partial redaction would diminish the documents' shock value and make [the plaintiff] less credible"); *Publius v. Boyer-Vine*, 237 F. Supp. 3d 997, 1004 (E.D. Cal. 2017) ("At its core, Plaintiffs' speech is a form of political protest. . . . [T]he legislators' home address and telephone number touch on matters of public concern in the context of Plaintiffs' speech."); *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 417, 419-20 (1971) (overturning injunction prohibiting dissemination of pamphlets containing the name and phone number of a realtor along with a request to "call [him] at his home phone number" to protest his "blockbusting" business practices).

Governor DeSantis' potential candidacy is a matter of public concern. The fact the signatories' audience is specifically Governor DeSantis, rather than the public at large, does not reduce their First Amendment interests. Accordingly, the petition's signatories should have a First Amendment right to "decide how [their] message should be communicated," *Ostergren*, 615 F.3d at 271 n.8, by including their contact information in their petition to him.

**Third**, the inclusion of contact information enhances the petition's legitimacy by increasing the likelihood each signature is real and allowing them to be authenticated. Should a name such as "C. Moore Bacon" pop up on the petition, without contact information it would be difficult to tell whether the signature was legitimate or a prank. *See* Emily Hall, *Romney Fundraising Organization: "C. Moore Bacon" is Real Deal*, WASH. POST (Sept. 18, 2013), https://www.washingtonpost.com/blogs/in-the-loop/wp/2013/09/18/romney-fundraising-organization-c-moore-bacon-is-real-deal/.

**Finally**, and perhaps most importantly, including signatories' contact information helps them associate with Governor DeSantis by enabling him to respond specifically to the signatories or otherwise engage with them. *Cf. Buckley*, 424 U.S. at People have a fundamental constitutional

right to associate with each other to engage in political expression and promote their political goals. *See Roberts v. U.S. Jaycees*, 469 U.S. 609, 618 (1984). The First Amendment protects reciprocal political communications. *See Lamont v. Postmaster General*, 381 U.S. 301, 305-06 (1965) (stating the First Amendment protects the right to both make and receive communications). Hindering a person's ability to make or receive political communications substantially burdens their ability to associate. *See FEC v. Akins*, 524 U.S. 11, 29 (1998) (recognizing "communications" as a fundamental component of the "constitutionally protected rights of association" (citing *United States v. Congress of Indus. Orgs.*, 335 U.S. 106, 121 (1948) (holding it would raise "the gravest" constitutional doubt to interpret a statute to prohibit unions or corporations from communicating with their members, stockholders, or customers))). It is Kafakaesque to conclude RFR may provide its petition to Governor DeSantis only if RFR censors contact information provided by the petition's signatories that would otherwise allow the Governor to respond to some or all of them.

Accordingly, the signatories' self-provided contact information is an integral part of RFR's petition and the signatories' speech, and is entitled to First Amendment protection. This Court should not accept the FEC's framing of the petition as essentially a letter accompanied by a completely unrelated and easily severable mailing list. Omission of the signatories' contact information substantially impacts the petition's expressive content and associational effect. Signatories have a First Amendment right to decide whether to engage in anonymous political speech, *McIntyre*, 514 U.S. at 342, or instead meaningfully identify themselves with more than a potentially fabricated, duplicative, or unverifiable name unaccompanied by any means of response.

        B.      *The FEC's Prohibition on RFR Providing Its Signed Political Petition to* <u>*Governor DeSantis is a Content-Based Prohibition Triggering Strict Scrutiny*</u>

This Court should conclude the FECA's contribution limits, as applied in the unique context of RFR's signed political petition, are subject to strict scrutiny and unconstitutional. The FEC argues RFR's petition should be seen as a letter to Governor DeSantis accompanied by a completely separate, unrelated, easily severable mailing list. It essentially contends the letter is the "tail wagging the dog" of the accompanying mailing list. Not so. To the contrary, the text of the letter appears to be the only reason the FEC claims authority to prohibit RFR from providing its signed petition to Governor DeSantis.

Assume RFR compiled a petition urging Governor DeSantis to support a particular piece of legislation or encouraging him to leave government and become head of the Walt Disney Corporation. The FEC presumably would not contend FECA either applies to such petitions or requires omission of the signatories' contact information, even if Governor DeSantis were testing the waters or had become a federal candidate. The gravamen of the FEC's concern actually isn't Governor DeSantis' receipt of the ostensibly valuable contact information incorporated within the petition. To the contrary, the FEC claims authority to censor RFR's political communications— and that of the petition's 225,000 signatories—only because the petition's text encourages Governor DeSantis to run for federal office. *See* 52 U.S.C. § 30101(8)(A)(i) (defining "contribution" as "any gift . . . of money or anything of value . . . ***for the purpose of influencing any election for Federal office***") (emphasis added).

The Supreme Court has held content-based restrictions on speech are subject to strict scrutiny. *See, e.g.*, *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2346 (2020). Strict scrutiny applies to such restrictions even if they were enacted with for unrelated innocuous purposes, *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 117 (1991), and "do[] not discriminate among viewpoints within that subject matter," *City of*

*Austin v. Reagan Nat'l Adver. of Austin, LLC*, 142 S. Ct. 1464, 1472 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015)). In *Reed*, 576 U.S. at 160, the Court applied strict scrutiny to an ordinance that subjected temporary signs to special prohibitions if they were "designed to influence the outcome of an election." The Court recognized the applicability of these restrictions "depend[ed] entirely on the communicative content of the sign." *Id*. at 164. According, the ordinance was a "content-based regulation of speech," *id*., subject to strict scrutiny, *id*. at 171, and unconstitutional, *id*. at 172.

    The same is true here—the only reason the FEC seeks to regulate RFR's petition is because its text seeks to persuade Governor DeSantis to run for office. *See* Tr. at 45 ("[I]t is the purpose of the donation and the receipt of that donation for the purpose of at least exploring a candidacy or actually running for office that makes this within FECA."). Accordingly, in the unique context of this case, this Court should apply strict scrutiny to the FEC's application of contribution limits to prohibit RFR from providing its signed petition to him. This reasoning is consistent with *Buckley*'s general approval of political contribution limits. Typical monetary and in-kind contributions entail only a "marginal" amount of communication. *Buckley*, 424 U.S. at 20-21. The contributions to which such limits typically apply are money and in-kind goods that lack any inherent expressive content. Consequently, contribution limits are generally subject only to intermediate scrutiny. *Id*. at 25. As applied in this case, however, the FEC invokes FECA's contribution limits specifically due to the content of RFR's pure political speech: the petition's encouragement of Governor DeSantis to run for President. Such a content-based restriction is an impermissibly overbroad method of attempting to prevent quid pro quo corruption, and is therefore unconstitutional.

    Moreover, as mentioned earlier, a person may convey a virtually identical list of signatories with accompanying contact information to Governor DeSantis, so long as the petition addresses

just about any public policy issue imaginable. The ability of speakers on virtually any other policy topic to convey such information to Governor DeSantis, severely undercuts the FEC's claim it has an important—much less a compelling—interest in preventing RFR from providing its petition to him. *See Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 805 (2011) (holding laws "affect[ing] First Amendment rights . . . must be pursued by means that are neither seriously underinclusive nor seriously overinclusive"); *see, e.g.*, *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 169 (2002). RFR's petition does not pose any greater risk of potential *quid pro quo* corruption than contact information embedded within petitions on any other issue, simply because RFR wishes to encourage Governor DeSantis to run for President. Thus, both the discriminatory nature of the FEC's prohibition, as well as its severe underinclusiveness in this context, further undermine the constitutionality of the FEC's position. *Buckley*, 424 U.S. at 45 (invalidating limits on independent expenditures and explaining they served "no substantial societal interest" because they were narrow and too easily circumvented to achieve the government's anti-corruption goals).

C.    *RFR's Signed Petition Would Be a Wasteful, Overpriced, Time-Consuming, and Ridiculously Inefficient Way of Attempting to Circumvent Contribution Limits and Engage in* Quid Pro Quo *Corruption*

This Court should not view RFR's efforts as a potential bad-faith way to circumvent contribution limits. RFR's petition-gathering process would be a terrible way of attempting to make an excessive in-kind contribution to a candidate or potential candidate. RFR has been gathering signatures for nearly a year. As of the end of 2021, as RFR's FEC filings demonstrate, RFR has spent a total of approximately $783,000 in connection with its petition, which has been

RFR's only activity.[5] RFR's next FEC filing will show RFR has spent a total of at least $1 million to compile its petition. *See also* Llanes Decl. ¶ 25 (explaining RFR's ongoing spending).

Undersigned counsel represents to the Court the petition presently contains approximately 225,000 signatures (up from approximately 100,000 signatures at the time of the original Llanes declaration, *see* Llanes Dec. ¶ 18). Under the FEC's approach, at the market rate of 0.05 cents per entry (as specified in the record), *see* Llanes Decl. ¶ 27, the value of the signatory contact information embedded within the petition would be $11,250. Even if the price per entry were twenty times as much—$1 each—the list's value would still be under a quarter-million dollars. Spending over a million dollars over more than a year in order to eventually, hopefully be able to funnel something worth a small fraction of that cost to a candidate or potential candidate would be an extraordinarily poor investment and does not pose a sufficiently realistic risk of corruption to justify a prohibition. *See McCutcheon v. FEC*, 572 U.S. 185, 213-14 (2014) (invalidating aggregate contribution limits, in part because it is "hard to believe that a rational actor would engage in . . . machinations" by spending $500,000 "to add just $26,000 to [a candidate's] campaign coffers"). To the extent RFR were seeking to enrich Governor DeSantis, it would have spent its million dollars soliciting monetary conduit contributions (which also would have enabled it to provide those *actual* contributors' contact information to Governor DeSantis, *see* 11 C.F.R. §§ 102.8(b)(1); 110.6(c)(1)(iii)-(iv)(A)). In short, a critical point that may have been obscured at oral argument is RFR's activities make almost no sense as some sort of nefarious circumvention scheme.

---

[5]  https://www.fec.gov/data/committee/C00815928/?cycle=2022.  RFR has made $281,000 in disbursements and taken out an additional $502,000 in loans for petition-related expenses. *Id*.

D.    *The FEC's Arguments Undermine Its Asserted*
      *Anti-Corruption and Anti-Circumvention Interests*

The FEC contends RFR can easily avoid any burdens on its rights by simply posting its signed petition, including signatories' contact information, on the Internet. At oral argument, the FEC declared, "[I]t would alleviate a lot of our concerns if the list that Ready for Ron wants to provide were just published online, and Governor DeSantis, along with other people, were able to look at that list and contact who they wanted to." Tr. at 39; *see also* Tr. at 46 (arguing RFR "could do it publicly," apparently referring to providing Governor DeSantis the signed petition by posting it with signatories' contact information on the Internet).

This argument appears to give away the ballgame. The FEC contends it must prohibit RFR from providing the signed petition to Governor DeSantis because the signatories' information is valuable and it creates a risk of *quid pro quo* corruption. The FEC offers no explanation as to how the purported risk of corruption is any less if RFR posts the signed petition on the Internet (thereby violating its signatories' privacy rights and exposing them to harassment and violence, *see Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2388 (2021)) rather than simply e-mailing or delivering it to Governor DeSantis.

In either case, RFR has used its "funds to create a thing of value." Tr. at 36; *see also id*. at 13 (discussing RFR's "plans to expend considerable resources on the petition"); *id*. at 32 (emphasizing arguing the signed petition is a contribution "specifically because of the money and other labor invested by Ready for Ron"). And in either case, the petition involves the "collection and compilation of information from tens of thousands, if not millions, of individuals nationwide." *Id*. at 13. Applying the FECA's contribution limits to RFR's signed petition cannot seriously further the FEC's claimed anticorruption and anticircumvention interests if RFR can provide the information at issue to Governor DeSantis by posting it on the Internet. *See Buckley*, 424 U.S. at

26

45 (invalidating easily circumvented restrictions on independent expenditures in substantial part because the provision would not "sufficiently relate[] to the elimination" of "actual or apparent quid pro quo arrangements"). And RFR should not have to subject the petition's signatories—who never consented to public disclosure of their names or contact information—to the possibility of harassment or violence to ensure Governor DeSantis receives the complete petition. *See* Statement of Reasons of Vice Chair Allen Dickerson and Commissioners Sean J. Cooksey and James E. "Trey" Trainor, III, *In re Joaquin Castro*, MUR 7635, at 2-3 (Dec. 3, 2021) (explaining how Congressman Joaquin Castro tweeted the names, pictures, and employer information for President Trump's top donors from the San Antonio area, blaming them for a race-related shooting at a nearby Walmart, subjecting them to a risk of intimidation, harassment, and violence).

E.    *The Supreme Court's Reasoning Upholding the Constitutionality of Contribution Limits is Inapplicable to a Signed Political Petition*

The preceding analysis ultimately leads back to RFR's fundamental point. When the *Buckley* Supreme Court rejected a facial challenge to contribution limits, it did not view them as applying to actual political speech in mind. *See Buckley*, 424 U.S. at 20-21 (holding contribution limits "entail[] only a marginal restriction upon the contributor's ability to engage in free communication" because "[a] contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis"); *see also id* at 21 ("A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication . . . ."). The Court noted any "expression rests solely on the undifferentiated, symbolic act of contributing." *Id*. at 21; *see also id*. ("At most, the size of a contribution provides a very rough index of the intensity of the contributor's support for the candidate."); *id*. (characterizing a contribution as only a "symbolic expression of support"). The Court further emphasized, "While contributions may result in

political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor." *Id*.

Unlike most applications of contribution limits, the FEC's attempt to extend FECA to RFR's signed petition is a "direct restraint" on the ability of both RFR and its contributors "to engage in free communication" to, and with, their desired candidate, Governor DeSantis. *Id*. at 20-21. The information conveyed by RFR's signed petition is far more than a "general expression of support" or an "undifferentiated, symbolic act." *Id*. Moreover, RFR's petition is political speech by RFR and the signatories themselves, and does not depend on any "transformation . . . by a candidate or . . . association." *Id*. at 21. Thus, the Court's rationales for subjecting contribution limits only to intermediate scrutiny are inapplicable to RFR's signed political petition, which is both core political expression and an important, time-honored form of political association. *Brown*, 444 U.S. at 363 (Brennan, J., dissenting). As with other restrictions on pure speech, the Court should apply strict scrutiny to the FECA's contribution limits as they apply to RFR's petition, and invalidate them on the grounds they neither further the Government's asserted interests nor are narrowly tailored to doing so. *See supra* Section II.C-II.D.

## III.     AT THE VERY LEAST, THE CONTACT INFORMATION INCORPORATED INTO THE PETITION SHOULD BE DEEMED CONDUIT CONTRIBUTIONS FROM EACH SIGNATORY. ACCEPTING THE PETITION WOULD NOT AUTOMATICALLY TRIGGER "CANDIDATE" STATUS FOR GOVERNOR DESANTIS

If this Court concludes that RFR's signed petition constitutes or includes a contribution, and that the First Amendment allows the FEC to apply contribution limits to the petition, then this Court should treat the petition as incorporating a series of individually miniscule in-kind conduit

contributions under 52 U.S.C. § 30116(a)(8) and 11 C.F.R. § 110.6. *See supra* Subsections I.A.2-I.A.3.

The FEC contends the petition constitutes a contribution because the signatory contact information incorporated into it is something of "value." 52 U.S.C. § 30101(8)(A)(i). The ostensibly valuable contact information in the petition did not originate with RFR, however. Rather, each of the petition's signatories voluntarily decided for themselves whether to sign the petition and provide their contact information. RFR's solicitations invite people to sign by notifying them that, by joining the petition, they are requesting RFR to provide their name and contact information to Governor DeSantis. Llanes Decl. ¶¶ 14-17. RFR has not and will not add anyone to its petition, or otherwise incorporate their contact information, without their express request and consent. *Id*. If this Court enables RFR to provide the signed petition to Governor DeSantis, RFR will be conveying the incorporated signatory contact information at each signatory's express direction and on their behalf.

Accordingly, RFR is acting as a mere conduit or intermediary for a potential candidate. 52 U.S.C. § 30116(a)(8); 11 C.F.R. § 110.6; *see, e.g.*, ActBlue, A.O. 2006-30, at 1, 4-5 (Nov. 9, 2006) (allowing ActBlue to act as a conduit committee for "draft" funds it establishes for "specific individuals who may become candidates" for the Democratic party's 2008 presidential nomination); *see also* ActBlue, A.O. 2014-19, at 4 (Jan. 15, 2015) (authorizing ActBlue to act as a conduit committee for "draft" funds it establishes on behalf of particular designated individuals to encourage them to become candidates). Each signatory should be regarded as the contributor of his or her own contact information, through RFR, to Governor DeSantis. *See* 52 U.S.C. § 30116(a)(8) (specifying a contribution made by a person through a conduit to a candidate "shall be treated as contributions from such person to such candidate"); *see, e.g., ActBlue*, A.O. 2014-19,

at 3 (holding contributions a person makes through a conduit committee to a candidate are regarded

as contributions from that person to the candidate); *accord ActBlue*, A.O. 2006-30, at 6; *WE LEAD*,

A.O. 2003-23, at 3 (Nov. 7, 2003).[6]

---

[6] In the event this Court chooses to treat RFR's provision of the signatory contact information incorporated into its petition to Governor DeSantis as conduit contributions, it should hold—whether under the absurdity canon or constitutional avoidance canon—RFR need not publicly reveal the identity of each individual signatory on its disclosure forms pursuant to 11 C.F.R. § 110.6(c)(1)(i), (iv)(A). ***First***, such a requirement would be a substantial and unjustified burden on RFR or any other substantial petition-gatherer. RFR, for example, would have to manually input a minimum of 450,000 individual entries into its FEC report: one reflecting RFR's receipt of each signatory's contact information, and another reflecting its "expenditure" by forwarding that information to Governor DeSantis. ***Second***, such compelled disclosure would violate the right to privacy of the petition's signatories. *Cf. NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958). Unlike financial contributors, they had no reason to believe they were making any sort of political contribution or that their identifies would be publicly disclosed, opening them to the potential for harassment, embarrassment, or even violence. *See Ams. for Prosperity Found v. Bonta*, 141 S. Ct. 2373, 2388 (2021) (noting the "risks" of politically motivated violence are "heightened in the 21st century and seem to grow with each passing year"). ***Third***, such compelled disclosure requirements would have a tremendous chilling effect on the willingness of people to join and identify themselves in future draft petitions for potential federal candidates. *See id.* at 2388 (invalidating disclosure requirement for private groups' contributors because it "'creates an unnecessary risk of chilling' in violation of the First Amendment" (quoting *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 968 (1984)).

 ***Fourth***, *Buckley*'s rationales for generally upholding compelled disclosure are inapplicable here. Neither the public nor the FEC generally knows the identity of each person who provides their contact information to a candidate. The public has no greater informational interest, and the FEC has no greater anti-corruption or anti-circumvention interests, in identifying each person who signed RFR's petition simply because they are providing their contact information through a conduit committee. *Cf. Buckley v. Valeo*, 424 U.S. 1, 66-68 (1976) (rejecting facial challenge to reporting requirements for campaign contributions because, "as a general matter, [they] directly serve substantial governmental interests"). ***Fifth***, the value of each person's name and contact information, on its own, is so individually *de minimis* that RFR should be excused from having to separately report each such in-kind contribution. *Cf. Hon. Cecil Heftel*, FEC A.O. 1977-51, at 2 (Nov. 16, 1977) (exempting a box of macadamia nuts from the usual rules governing contributions in part because they "appear to be of minimal value").

 ***Finally***, contributions from individuals are generally reported to the FEC only if they exceed $200. *See, e.g.*, 11 C.F.R. § 104.3(a)(4)(i). Conduit committees, in contrast, are generally required to report all of the contributions they transmit to candidates, *id.* § 110.6(c)(1)(iv)(A), primarily to allow both the FEC and the recipient candidate to ensure the contributor is not exceeding their contribution limits, *see* Tr. at 41 ("[W]e do require enough information so that we can verify who the [contributor to the conduit committee] is so that they're not making multiple contributions to a single person."). These concerns are inapplicable where a person's in-kind contribution is the

RFR, in turn, is therefore legally obligated to transmit to Governor DeSantis the signatory contact information it has received to incorporate into its signed petition. *See* 11 C.F.R. § 102.8(c). RFR is not deemed to be the contributor of any of these in-kind contributions. *See id*. § 110.6(d)(1) (noting conduit contributions do not count against the conduit's or intermediary's contribution limits). The value of each of these in-kind contributions—the contact information for each signatory—is well below each contributor's contribution limit of $3,300 per election. 52 U.S.C. § 30116(a)(1)(A); *see also* FEC, *Price Index Adjustments for Contribution and Expenditure Limitations and Lobbying Bundling Disclosure Threshold*, 88 Fed. Reg. 7088, 7090 (Feb. 2, 2023). Thus, RFR may provide the signed petition to Governor DeSantis regardless of whether he is testing the waters or has become a candidate.

In the event this Court allows RFR to provide its signed petition to Governor DeSantis under this approach, his acceptance of the petition would not automatically trigger "candidate" status. *Cf*. Tr. at 7-8, 10, 53-54, 57 (suggesting Governor DeSantis "might just find himself, if he accepts [the petition], as a candidate"). As a constitutional matter, it would be a severe burden on RFR's rights of political speech and association to conclude a person automatically becomes a candidate simply because they accept RFR's signed political petition encouraging them to become a candidate. In any event, at most, rather than triggering candidacy status, RFR's provision of its signed petition to Governor DeSantis would fall within the FEC's "testing the waters" regulation, 11 C.F.R. § 100.72.[7]

---

provision of their own name and contact information. Yet again, these issues and difficulties simply underscore the fact that, taken as a whole, the FECA simply does not contemplate the term "contribution" will be applied to names and contact information that people choose to provide to candidates, whether directly, through conduit committees, or as part of political petitions.

[7] RFR has challenged the validity of § 100.72 to the extent it imposes contribution limits on non-candidates who are merely considering the possibility of running for office. In the event this Court

The FEC has vigorously defended § 100.72 in this case, despite the regulation's lack of clear statutory authorization, on the grounds it "reduce[s] the burdens on prospective candidates for federal office, who could otherwise be subject to the automatic thresholds triggering 'candidate' status under FECA." FEC Opposition to Plaintiff's Motion for Preliminary Injunction, D.E. #16, at 33 (Feb. 1, 2023). Under the FEC's own view, § 100.72 provides a safe harbor for Governor DeSantis to accept the signed petition without thereby being deemed a candidate. *Cf.* Tr. at 45 (concession by counsel for the FEC that accepting the petition might mean Governor DeSantis is "testing the waters," rather than becoming a candidate). Accordingly, contribution limits would not prohibit RFR from providing its signed petition to Governor DeSantis at any time, and the Governor may accept it without thereby automatically becoming a candidate.

## **CONCLUSION**

For these reasons, this Court should grant Plaintiff RFR's Motion for a Preliminary Injunction and grant judgment or summary judgment to RFR on Counts I, II, III, and V.

March 14, 2023

_____/s/ Dan Backer_____
Dan Backer, Esq. (D.C. Bar No. 996641)
Chalmers, Adams, Backer & Kaufman LLC
441 N. Lee Street, Suite 300
Alexandria, VA 22314
(202) 210-5431
dbacker@ChalmersAdams.com

---

concludes RFR's signed petition does not constitute a "contribution" at all, *see supra* Part I, § 100.72's contribution limits would be inapplicable to the petition and RFR's challenge to that regulation would be mooted. Similarly, should this Court instead conclude the ostensibly valuable information in the petition constitutes conduit contributions from the petition's signatories to Governor DeSantis, *see supra* Part III, RFR would not be providing an excessive contribution to him. Consequently, its challenge to the regulation would again be mooted.

 In any event, § 100.72 may provide a safe harbor for non-candidates' acceptance of financial and other assistance without simultaneously subjecting them to contribution limits. As a policy matter, it may make great sense to impose contribution limits on people considering the possibility of running for federal office. The plain text of FECA's contribution limits, however, apply only to actual candidates. 52 U.S.C. § 30116(a)(1)(A).

Lilian Rodriguez-Baz, Esq.*
Chief Legal Counsel, Ready for Ron
66 W Flagler Street, Suite 900
Miami, FL 33130
(561) 291-9897
Lilian@ReadyForRon.com

*Admitted pro hac vice
*Attorneys for Plaintiff*

## NOTICE OF ERRATA

Some of RFR's previous filings referred to an FEC advisory opinion with the citation *ActBlue*, A.O. 2008-10 (Jan. 15, 2015). RFR was discussing an opinion in with the Commission approved conduit contributions into "draft" funds, to allow people to make contributions earmarked for specific women who had not yet become presidential candidates. The correct citation for that advisory opinion, utilized in this memorandum, is *ActBlue*, A.O. 2014-19, at 4-6 (Jan. 15, 2015).

Any inadvertent references by RFR to A.O. 2008-10 in previous filings should be understood as references to A.O. 2014-19 instead. The actual A.O. 2008-10 appears to be irrelevant to this case. RFR respectfully apologizes for any confusion or inconvenience.

33