**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| READY FOR RON, | |
| *Plaintiff*, | |
| v. | Civil Action No. 22-3282 (RDM) |
| FEDERAL ELECTION COMMISSION, | |
| *Defendant*. | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

READY FOR RON ("RFR") is a political committee that has spent more than $1 million soliciting and gathering signatures and contact information from over 200,000 people who have declared themselves "Ready for Ron." Dkt. 1 at 5 (Compl. ¶ 6); Dkt. 17 at 8. RFR would like to deliver the "petition" that it has created to Florida Governor Ron DeSantis, along with a letter urging him to become a candidate for the Republican nomination for President in the 2024 election. Dkt. 1 at 7 (Compl. ¶ 17). Before taking this step, however, RFR sought an advisory opinion from the Federal Election Commission ("FEC" or "Commission") addressing whether and when it could do so consistent with the federal campaign finance laws. Dkt. 23-2 at 1. According to RFR, presenting Governor DeSantis with a "petition" would constitute pure political speech beyond the constitutional or statutory reach of these laws. *Id.* at 12–13.

The FEC declined to bless RFR's proposal. *Id.* at 190–200. In particular, the Commission disapproved of RFR's insistence that it provide Governor DeSantis not only its petition but also the e-mail address and/or phone number of every signatory. *Id.* at 193. The Commission unanimously concluded that RFR was, in all but name, seeking permission to provide Governor DeSantis with an in-kind contribution—that is, a contact list in the guise of a

petition. *Id.* at 194. Based on that conclusion, the Commission further held that were Governor DeSantis to begin to test the waters for a run, and similarly were he to become a candidate, the campaign finance laws would preclude RFR from delivering that contact list to him because the market value of the list exceeds the relevant contribution limit and because RFR funded its drive with a combination of regulated funds (hard money) and unregulated funds (soft money). *Id.* at 195, 197, 199. The Commission was unable to garner a majority, however, on the question whether RFR may deliver the list to Governor DeSantis before he begins to test the waters. *Id.* at 199. It thus left that portion of RFR's request for an advisory opinion unanswered. *Id.*

RFR commenced this lawsuit in response, seeking declaratory and injunctive relief that would permit it to deliver the petition to Governor DeSantis at any time without risking an enforcement action. Dkt. 1 (Compl.). It subsequently moved for a preliminary injunction. Dkt. 8-1. After oral argument, the parties agreed to treat RFR's preliminary injunction motion as a motion for summary judgment, except to the extent that RFR's claims arise under the First Amendment. Dkt. 27 at 1, 5. Both of those motions—RFR's motion for a preliminary injunction with respect to its First Amendment claims, and its motion for summary judgment with respect to its other claims—are now ripe for decision.

As explained below, the Court agrees with the Commission that what RFR calls a petition is, in fact, a contact list and, more importantly, an in-kind contribution. As such, the list is subject to the contribution limits contained in the Federal Election Campaign Act ("FECA" or the "Act"), 52 U.S.C. §§ 30101 *et seq.*, and it is now well-trod ground that those limits satisfy constitutional dictates. Finally, although the Commission did not entirely resolve the question, the Court concludes that it makes no difference whether Governor DeSantis has declared his candidacy, whether he has invoked the regulatory exception for "testing the waters," or whether

he has done neither at the point at which he accepts RFR's contact list.  By accepting the list, he would necessarily commit himself to either a candidacy or testing the waters, both of which require contributors (including in-kind contributors) to comply with FECA's contribution limitations.  To hold otherwise would invite massive evasion of the campaign finance laws by allowing those seeking office simply to wait to declare their candidacies or to invoke the testing-the-waters exception until after they have assembled war-chests of non-FECA-compliant contributions.  Congress precluded circumvention of this type by defining a candidate as anyone who receives "contributions aggregating in excess of $5,000," 52 U.S.C. § 30101(2)(A), and by defining a "contribution" to include "any gift . . . of money or anything of value made by any person for the purposes of influencing any election for Federal office," *id.* § 30101(8)(A)(i).

The Court will, accordingly, **DENY** RFR's motion for summary judgment on its non-First Amendment claims and will **DENY** RFR's motion for a preliminary injunction on its First Amendment claims.

## I.  BACKGROUND

### A.    Statutory and Regulatory Background

The Federal Election Campaign Act sets forth a comprehensive scheme regulating federal campaign finance.  Among other things, FECA limits the amount that a "person" may "contribut[e]" to a "candidate" with respect to an "election for Federal office" to $3,300.  52 U.S.C. §§ 30116(a)(1)(A), 30116(c), 11 C.F.R. § 110.1(b)(1).[1]  Because this case turns in

---

[1] At the time the parties initially briefed the pending motion, the limit was $2,900, but it increased to $3,300 on February 2, 2023.  *Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold*, 88 Fed. Reg. 7088, 7090 (Feb. 2, 2023).

considerable part on the meaning and scope of this limitation, the Court describes each of its components in turn.

Under FECA, a "person" includes, among other things, a political "committee." 52 U.S.C. § 30101(11), (4). RFR does not dispute that it is a "person" within the meaning of the Act. Dkt. 8-1 at 36 n.4.

FECA defines a "contribution" to include "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i). As the capacious terms "any gift" and "anything of value" suggest, contributions are not limited to the donation of money and include "the provision of in-kind assistance." *Buckley v. Valeo*, 424 U.S. 1, 36–37 (1976); *see also Campaign Legal Ctr. v. FEC*, 31 F.4th 781, 784–88 (D.C. Cir. 2022) ("[U]tilizing political committee staff time, office space, or other resources in cooperation with a candidate counts as a contribution."). FEC regulations define in-kind contributions as "the provision of any goods or services without charge or at a charge that is less than the usual and normal charge for such goods or services." 11 C.F.R. § 100.52(d)(1). Such "goods or services" include "membership lists" and "mailing lists." *Id.*

FECA defines a "candidate" as "an individual who seeks nomination for election, or election, to Federal office." 52 U.S.C. § 30101(2). And FECA "deem[s]" an individual to be "seek[ing] nomination for election, or election, to Federal office"—*i.e.*, to be a candidate—if "such individual has received contributions aggregating in excess of $5,000 or has made expenditures aggregating in excess of $5,000." *Id.* § 30101(2)(A). So under the statute, the "recei[pt]" of over $5,000 in "contributions" makes a person a "candidate." *Id.* But not everyone who receives $5,000 is a candidate, only those who receive $5,000 (or $5,000 worth of

in-kind assistance) that was provided "for the purpose of influencing any election for Federal office." *Id.*; *id.* § 30101(8)(A)(i).

Although FECA's definition of "candidate" does not admit of obvious exceptions, the FEC has recognized a limited one "for individuals wishing to 'test the waters' of a potential candidacy." *Campaign Legal Ctr. v. FEC*, 520 F. Supp. 3d 38, 43 (D.D.C. 2021). Under the FEC's testing-the-waters regulations, "[f]unds received" or "[p]ayments made" "solely for the purpose of determining whether an individual should become a candidate" are not treated as immediately reportable contributions or expenditures. 11 C.F.R. §§ 100.72(a), 100.131(a). Instead, the recipient need not report the contributions or expenditures unless and until the "the principal campaign committee of the candidate" files its "first report," "regardless of the date the funds were received" or "the payments were made." 11 C.F.R. §§ 100.72(a), 100.131(a). These regulations, then, are an *exemption* from that which FECA would otherwise require: if an individual accepts "contributions aggregating in excess of $5,000," 52 U.S.C. § 30101(2)(A), she automatically becomes a "candidate" under the statute, subject to all related obligations, unless the testing-the-waters exceptions offers shelter from some such requirements.[2]

This exemption is valuable, because it allows those considering candidacies to do so discretely. If funds raised and expended for the purpose of exploring a candidacy—conducting preliminary polling and travel, for instance—were treated as reportable contributions or expenditures under the Act, they would have to be publicly disclosed. The testing-the-waters regulations "permit individuals to conduct certain activities while deciding whether to become a

---

[2] As explained further below, RFR does not dispute that it seeks to deliver its petition and contact list to Governor DeSantis "for the purpose of influencing an[] election for Federal office," 52 U.S.C. § 30101(8)(A)(i), or, more precisely, "to persuade Governor DeSantis to become and remain a candidate for the Republican nomination for President in the 2024 election," Dkt. 1 at 5 (Compl. ¶ 9).

candidate for Federal office, without making their activities immediately public." *Payments Received for Testing the Waters Activities*, 50 Fed. Reg. 9993 (Mar. 13, 1985).

But testing the waters does not mean that anything goes.  Recognizing that permitting an individual to receive (and to expend) contributions in excess of the contribution limits and from prohibited sources while "testing the waters" would invite "circumvention of the prohibitions and limitations of the Act," the FEC revised the exemption in 1985 to "require that all funds received" under the exemption remain "subject to the Act's limitations and prohibitions." *Id.* at 9994.  The revised rule was "intended to clear up any misconceptions that the 'testing the waters' provisions may be used," for example, "to raise 'seed money' for prospective candidates." *Id.* As a result, large donors cannot use the exemption to evade contribution limits, and prohibited sources (including foreign interests, corporations, and unions) cannot use the exemption to make otherwise unlawful contributions.  Thus, although by their terms the testing-the-waters regulations provide that certain (but not all) funds received by an individual considering a run for office "are not contributions" (at least until the person declares her candidacy), 11 C.F.R. §§ 100.72(a), 100.131(a), in practice the regulations carve out a limited exception to the Act's disclosure requirements for those who receive contributions in excess of $5,000 (and who, accordingly, are technically "candidates" under FECA) while they consider a candidacy.

FECA does not regulate all money spent in politics to the same degree.  Contributions to candidates—as those terms have been defined above—must be made with money subject to FECA's disclosure requirements and source and amount limitations.  *See McConnell v. FEC*, 540 U.S. 93, 122 (2003), *overruled in part on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010).  These FECA-compliant funds are known as "hard money." *Id.*  Conversely, funds that are not subject to FECA's strictures are known as "soft money."  *See Carey v. FEC*, 791 F. Supp.

2d 121, 126 (D.D.C. 2011). Political committees may raise and spend unlimited quantities of soft money, subject to two constraints: (1) such committees must not be connected to or authorized by a particular candidate, and (2) the soft money must be spent on "independent expenditures"—expenditures that are not made to or spent in coordination with a candidate, a candidate's authorized committee, or a political party committee. *See id.*

In order to allow participants in the political process to operate with substantial certainty regarding their legal obligations, the Act permits people to request advisory opinions from the FEC regarding whether a "specific [proposed] transaction or activity by the person" is legally permissible. 52 U.S.C. § 30108(a)(1). The FEC is required to accept comments on the request and to issue a response within sixty days. *Id.* § 30108(a)(1), (d). FECA specifies, however, that no advisory opinion shall issue absent "the affirmative vote of 4 members of the Commission." *Id.* § 30106(c). If four commissioners are unable to agree on the content of an advisory opinion, the FEC issues a response stating that it was "unable to approve an advisory opinion by the required affirmative vote of 4 members." 11 C.F.R. § 112.4(a). But if at least four commissioners agree to approve the proposed course of action—so a favorable advisory opinion issues—the party who requested the opinion, "and any person involved in an identical transaction or activity to that described in the request, may rely in good faith on the opinion and will be protected from any sanction under FECA that might otherwise attach to the transaction or activity." *McCutcheon v. FEC*, 496 F. Supp. 3d 318, 324–25 (D.D.C. 2020) (citing 52 U.S.C. § 30108(c)). Only a favorable advisory opinion provides this safe harbor. Both the issuance of an opinion disapproving the proposed action and the failure to issue an opinion because of disagreement amongst commissioners deprive the requester of any protection against subsequent

enforcement.  *See Unity08 v. FEC*, 596 F.3d 861, 865 (D.C. Cir. 2010); *Chamber of Com. of the U.S. v. FEC*, 69 F.3d 600, 603–04 (D.C. Cir. 1995).[3]

## B.    Factual Background

RFR is a political committee "formed for the purpose of drafting [Florida Governor] Ron DeSantis as a candidate for the Republican nomination for President in the 2024 election."  Dkt. 23-2 at 2.  It has not been authorized by Governor DeSantis and is not acting in coordination with him or any political committees he has authorized.  *Id.* at 1, 3.  RFR is a "hybrid" committee, meaning that it raises and spends both hard and soft money.  Dkt. 1 at 5 (Compl. ¶ 7).

RFR has devoted itself to the compilation of what it refers to as a "petition" encouraging Governor DeSantis to run for president.[4]  As of February of this year, RFR had expended over $1

---

[3] Both the issuance of an unfavorable advisory opinion and the non-issuance of an opinion create a justiciable controversy for Article III purposes.  In either case, the requester has been "deprive[d] . . . of a legal right" that "it would enjoy if it had obtained a favorable resolution in the advisory opinion process."  *Unity08 v. FEC*, 596 F.3d 681, 865 (D.C. Cir. 2010).  As a result, "[n]othing . . . prevents the Commission from" instituting an enforcement action "at any time," including after, "perhaps, another change of mind of one of the Commissioners" in the case of a deadlocked non-opinion.  *Chamber of Com. of the U.S. v. FEC*, 69 F.3d 600, 603 (D.C. Cir. 1995).  What is more, FECA "permits a private party to challenge the FEC's decision *not* to enforce," so "even without a Commission enforcement decision," a requester is "subject to litigation challenging the legality of [its] actions."  *Id.* (emphasis in original).  Finally, FECA's restrictions bear on First Amendment interests, and "[a] party has standing to challenge, pre-enforcement, . . . the constitutionality of a statute if First Amendment rights are arguably chilled, so long as there is a credible threat of prosecution."  *Id.* (emphasis omitted).

[4] The petition reads:

> America is in grave danger from the Radical Left and their failed, socialist, woke policies.  The America-First agenda MUST be revived.  Governor Ron DeSantis is the next Great American President—like Ronald Reagan and Donald Trump—who will turn our country around.  We must organize NOW—we cannot wait and let the Left take another election.  I am Ready for Ron!  Let Ron know I'm behind him and want to join his team!

Dkt. 8-3 at 1.

million "soliciting and gathering over 200,000 real, electronic, and telephonic signatures with contact information" for this petition. Dkt. 17 at 8. It expects to spend a further $25,000-50,000 per week for the duration of the 2024 election. Dkt. 1 at 9 (Compl. ¶ 25). RFR has spent both hard and soft money on this project, purchasing television, social media, and other advertisements and acquiring contact lists that it has used for robocalls and mass e-mail campaigns. Dkt. 1 at 8–9 (Compl. ¶¶ 21, 23, 25); Dkt. 8-2 at 2–3, 5 (Llanes Decl. ¶¶ 9, 16, 25). These communications explain the purpose of the petition and urge recipients to add their names and contact information. Dkt. 1 at 8–9 (Compl. ¶ 21). RFR requires signatories to provide either an e-mail address or phone number. *Id.* at 9 (Compl. ¶ 26); Dkt. 8-2 at 3 (Llanes Decl. ¶ 13).

RFR would like to present its petition, complete with the names and contact information of the signatories, to Governor DeSantis at a time to be determined. Dkt. 23-2 at 4.[5] After doing so, it wants to continue to provide him regular updates, with new names and contacts it has compiled, for the duration of any presidential campaign he might undertake. *Id.*

---

[5] RFR's proposed letter to Governor DeSantis states:

> Please accept this petition to express the widespread public support to draft you to become, and remain, a candidate for the Republican nomination for President in the 2024 election and, when nominated, a candidate for the office of President of the United States.

> All of the signatories below have virtually signed this petition to demonstrate their support. They provided Ready for Ron with their names and contact information to convey to you as part of this petition on their behalf. They have endorsed the following message:

> [Text of the petition]

> Thank you for your continued leadership. Enclosed as part of this petition are the virtual signatures and contact information of the signatories who have joined together to express their political beliefs and persuade you to run for President.

Dkt. 8-4 at 1–2.

By RFR's own admission, the petition it has created has a market value of greater than $3,300. *Id.*; Dkt. 1 at 9–10 (Compl. ¶ 26). The value lies in the contact information: RFR estimates that "[a] reasonable sample market value of contact information in political distribution lists is presently approximately 5 cents each," Dkt. 23-2 at 4; Dkt. 8-2 at 5 (Llanes Decl. ¶ 27), meaning that RFR's list hit the $3,300 threshold when it reached 66,000 signatories, a number it has now well surpassed. RFR believes that it "will likely amass well over a million . . . signatures" before all is said and done. Dkt. 23-2 at 4.

In May 2022, RFR submitted a request for an advisory opinion to the FEC. Dkt. 23-2 at 1. It sought guidance on whether it could present its "petition" to Governor DeSantis and, if so, whether it was required to do so either before Governor DeSantis began testing the waters or before he became a candidate. *Id.* at 4–5.

After considerable back and forth between RFR and the FEC and a public hearing, the FEC issued an opinion that largely disapproved RFR's proposed course of action. *Id.* at 190–200. The FEC unanimously concluded that RFR could not give the "petition" to Governor DeSantis if he becomes a candidate or begins testing the waters. *Id.* at 193. According to the FEC, this was so for two reasons: First, the "petition"—or, more precisely, the contact information that RFR plans to include—constitutes a contact list that is a "thing of value" worth more than $2,900 (the then-applicable limit). *Id.* at 194–96. In the Commission's view, because the petition contains the contact information of signatories (and has been compiled at considerable expense), it is indistinguishable from well-established categories of in-kind contributions like mailing and contributor lists. *Id.* at 194–95. As such, providing it to Governor DeSantis free of charge when he is a candidate or is testing the waters would either constitute an unlawful campaign contribution or would violate the testing-the-waters exception. *Id.* at 195–97.

Second, because RFR has funded the creation of the petition in part with soft money, providing the petition to Governor DeSantis would violate the restriction on making contributions of soft money to candidates. *Id.* at 198–99 (citing 52 U.S.C. § 30125(e)(1)(A)). The FEC, however, was unable to obtain the requisite four affirmative votes for an advisory opinion addressing whether RFR could provide the petition to Governor DeSantis *before* he begins testing the waters, so it issued no decision on that score. *Id.* at 199.

## C.    Procedural Background

RFR filed this lawsuit on October 27, 2022. Dkt. 1 (Compl.). It brings six claims for relief: (1) a First Amendment claim brought directly under the Constitution, the gravamen of which is that the FEC's advisory opinion violates the First Amendment as do FECA's contribution limits (and associated regulations) as applied to RFR's proposed course of action; (2) an Administrative Procedure Act ("APA") challenge to the FEC's advisory opinion (and failure to issue a favorable advisory opinion) as arbitrary, capricious, and contrary to law; (3) a claim under the Declaratory Judgment Act seeking a declaration that the advisory opinion is unenforceable and that the First Amendment and FECA permit RFR to fund and submit its petition to Governor DeSantis as it wishes; (4) an "Equitable Claim for Injunctive Relief" seeking a permanent injunction barring the FEC from enforcing FECA's contribution limits against it in connection with its providing the petition to Governor DeSantis; (5) a statutory claim brought directly under FECA seeking a "declaration of right" that its proposed actions are permissible under the statute and an injunction prohibiting the FEC from bringing an enforcement action related to its proposed conduct; and (6) an APA challenge to the testing-the-waters regulation. Dkt. 1 at 31–40 (Compl. ¶¶ 93–131).

RFR has since conceded that its "equitable claim for injunctive relief" does not constitute a distinct claim but, instead, is merely a request for relief on its other claims, and it has essentially conceded (as it must) that FECA does not establish an independent cause of action applicable here.  Dkt. 17 at 12 n.1.  In addition, although RFR does not concede the point, RFR's Declaratory Judgment Act claim is not substantively distinct from its constitutional, statutory, and regulatory claims, and thus that claim is best viewed as a request for declaratory relief should RFR prevail on its substantive arguments.[6]  *Cf. Malek v. Flagstar Bank*, 70 F. Supp. 3d 23, 28 (D.D.C. 2014).  In substance, then, RFR has brought (1) an as-applied First Amendment challenge to the advisory opinion and FECA's contribution limits, (2) an APA challenge to the advisory opinion (which implicates the interpretation of FECA and FEC regulations), and (3) an APA challenge to the testing-the-waters regulation.  If successful on any of these claims, RFR then requests appropriate declaratory and injunctive relief.

Approximately two months after filing suit, RFR moved for a preliminary injunction. Dkt. 8.  It asks the Court to enjoin the FEC from instituting enforcements proceedings against it related to its plan to give its petition to Governor DeSantis at any time (before or after Governor DeSantis tests the waters or becomes a candidate), providing Governor DeSantis periodic updates to the petition thereafter, and accepting unlimited soft money and spending this money in connection with the petition.  *Id.* at 1–2.  It also requests an injunction against the enforcement of the testing-the-waters regulations.  *Id.* at 2.  The Court held a motion hearing on February 28,

---

[6] RFR seems to treat its statutory FECA arguments as substantively distinct from its APA claim, Dkt. 17 at 12 n.1.  But in the Court's view, RFR's APA claim turns at least in part on the correct interpretation of FECA and the FEC's regulations.

2023, Min. Entry (Feb. 28, 2023), at which it requested supplemental briefing on certain issues, which the parties have now provided, Dkt. 24; Dkt. 25; Dkt. 26; Dkt. 28.

Following the motion hearing, the parties consented to treating RFR's motion for a preliminary injunction as one for summary judgment and a permanent injunction for all counts except Count I, RFR's constitutional claim. Dkt. 27 at 1–2. Because portions of RFR's APA claims assert essentially the same First Amendment challenge, the Court also considers those portions outside the scope of the parties' consent to resolution for summary judgment purposes. RFR would also treat its preliminary injunction motion as one for summary judgment as to the First Amendment issues, but the FEC has requested discovery as to these issues. *Id.* at 2. RFR contends that discovery is unnecessary and would needlessly delay resolution of this matter. *Id.*

The Court will, accordingly, treat RFR's preliminary injunction motion as a motion for summary judgment and a permanent injunction as to all non-First Amendment claims, whether asserted directly under the Constitution or pursuant to the APA. This will require the Court to apply the preliminary injunction standard to RFR's First Amendment claims, and the summary judgment standard to its remaining claims.

## II. STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remedy," *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022), and in deciding whether to grant it the Court must ask four questions: Is the movant likely to succeed on the merits of its claims? Will the movant likely suffer "irreparable harm in the absence of preliminary relief"? Does the balance of equities favor preliminary relief? And is an injunction in the public interest? *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "In First Amendment cases, the likelihood of success will often be the determinative factor in the preliminary injunction analysis." *Green v. United States Dep't of*

*Just.*, 54 F.4th 738, 745 (D.C. Cir. 2022) (quoting *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

At one time the courts in this circuit applied a "sliding-scale" approach under which "a strong showing" on one of the preliminary injunction factors could make up for a "weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). But after the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), the D.C. Circuit has suggested although never squarely held that this approach is no longer appropriate, at least as to likelihood of success, which is a "free-standing requirement" for a preliminary injunction. *Sherley*, 644 F.3d at 393 (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring)). As noted, because irreparable injury is typically presumed when the moving party has established a likelihood of success on the merits of a First Amendment challenge, the availability (or not) of the sliding-scale approach is of little consequence in this case.

RFR's other claims—those that the Court will resolve under the summary judgment standard—are APA claims seeking equitable and declaratory relief. The Court will, accordingly, consider these claims under the familiar APA standard of review, which requires the Court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In an APA case, summary judgment "serves as a 'mechanism for deciding, as a matter of law, whether the agency action is . . . consistent with the APA standard of review.'" *Fisher v. Pension Benefit Guar. Corp.*, 468 F. Supp. 3d 7, 18 (D.D.C. 2020) (quoting *Cayuga Nation v. Bernhardt*, 374 F. Supp. 3d 1, 9 (D.D.C. 2019)). In essence, "the district judge sits as an appellate tribunal," and "the entire case

14

on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks omitted).

### III.  ANALYSIS

RFR raises a host of statutory and constitutional challenges.  The Court starts with RFR's statutory challenges, which take a variety of forms, and then turns to its constitutional claims.

### A.

RFR's lead argument is that its petition is not a contribution under FECA and thus is not subject to FECA's contribution limitations.  The Court is unpersuaded.

Some clarification is in order at the outset.  The FEC stresses that it sees no problem with RFR providing its petition—complete with the list of signatures—to Governor DeSantis.  Dkt. 16 at 29 ("[T]he contribution limit applies only to restrict the private transfer of the mailing list with contact information, not the petition to which it is attached."); Dkt. 22 at 36 (noting that RFR "has many alternative avenues for communicating its message" including through "a petition without the contact information"); *id.* at 39–40 ("[W]e are concerned not with the message that Ready for Ron is trying to communicate at all . . . we have gone specifically for the contact information . . . .").  Its only concern arises from RFR's plan to provide Governor DeSantis with the contact information of the signatories, because that compilation of contact information is, in all but name, a mailing or contact list.  *Id.*  As a result, RFR's framing of this case as one about its "petition" is inaccurate.  Rather, the dispute is about the contact list.  Going forward, then, the Court will refer to the operative item as a "contact list," unless the accompanying petition is somehow relevant.

Whether the FEC correctly determined that RFR's contact list falls within FECA's definition of a "contribution" is a question of statutory construction.  The D.C. Circuit has held

that FEC advisory opinions interpreting FECA are entitled to *Chevron* deference, *FEC v. Nat'l Rifle Ass'n of Am.*, 254 F.3d 173, 184–86 (D.C. Cir. 2001); *see also FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981) (stating that the FEC is "precisely the type of agency to which deference should presumptively be afforded"), so the Court would typically review the agency's interpretation of FECA under the familiar *Chevron* framework.  Here, however, although *Chevron* applies, pacing through the *Chevron* two-step is unnecessary because the FEC's conclusion that RFR's contact list constitutes a "contribution" under FECA is "not only reasonable but also the best interpretation of the statute," and it is the one the Court would adopt irrespective of *Chevron*.  *Wash. Reg'l Medicorp v. Burwell*, 813 F.3d 357, 362 (D.C. Cir. 2015); *cf. Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 45 F.4th 306, 314 (D.C. Cir. 2022) ("[T]here is no need to decide what deference, if any, a regulation should receive where we can conclude that the agency's interpretation of the statute is the best one.").  So the Court need only interpret FECA using the traditional tools of statutory construction and leave it at that.

The contact list that RFR proposes to give to Governor DeSantis easily falls within the Act's definition of a "contribution."  Under that definition, a contribution is, in relevant part, "any gift . . . of money or anything of value made by any person for the purpose of influencing any election for Federal office."  52 U.S.C. § 30101(8)(A)(i).  RFR does not contest that it would like to provide its petition and contact list to Governor DeSantis in order to "influenc[e] an[]] election for Federal office."  *Id.*  Quite the opposite; it freely acknowledges that its goal is to convince Governor DeSantis to run for President, to remain a candidate throughout the election cycle, and, one can only assume, to prevail in that effort. Dkt. 1 at 5–7 (Compl. ¶¶ 9–17).  The petition itself declares that "Governor Ron DeSantis is the next Great American President . . .

who will turn our country around," and it invites signatories to "[l]et Ron know [they are] behind him and want to join his team!"  Dkt. 8-3 at 1.  The FEC, moreover, soundly concluded that the contact list constitutes more than unadorned advocacy urging Governor DeSantis to join the race or urging others to support him.  Rather, it is a uniquely effective, tangible tool designed to assist him in pursing the presidency.  Dkt. 23-2 at 195–96.[7]  So, the question is whether the contact list is a "gift" of "anything of value."  52 U.S.C. § 30101(8)(A)(i).

Begin with the word gift, which means "something that is voluntarily transferred by one person to another without compensation."  *Gift*, Webster's Third New International Dictionary (2d ed. 1976) (def. 2); *accord Gift*, Webster's Third New International Dictionary (3d ed. 1993) (identical definition); *Gift*, Oxford English Dictionary (3d ed. Mar. 2023) (def. II.3.a "Something, the possession of which is transferred to another without the expectation or receipt of an equivalent; a donation, present"); *Gift*, Oxford English Dictionary (2d ed. 1989) (identical definition); *Gift*, Black's Law Dictionary (10th ed. 2014) ("The voluntary transfer of property to another without compensation"; "A thing so transferred").  Thus if RFR voluntarily transfers its

---

[7] The Court notes that the implicit position the FEC has taken in this case with respect to what sorts of transfers are made "for the purpose of influencing any election for Federal office," 52 U.S.C. § 30101(8)(A)(i), is consistent with that which it has taken previously.  In *ActBlue*, FEC Advisory Op. 2006-30 (Nov. 9, 2006), https://www.fec.gov/files/legal/aos/2006-30/2006-30.pdf, the FEC approved a proposal by ActBlue to solicit and receive funds for prospective candidates for the 2008 presidential election and to withhold remitting those funds to the prospective candidates until they in fact registered as candidates.  *Id.* at 1.  But it cautioned that if these earmarked contributions were forwarded "to a Prospective Candidate before that person register[ed]" their candidacy, "both ActBlue and the Prospective candidate should recognize that a Prospective Candidate who receives contributions aggregating in excess of $5,000 becomes a candidate under the Act and . . . must register [as such]."  *Id.* at 5.  This analysis presumes that transfers made for the purpose of supporting the potential candidacy of a prospective candidate can constitute contributions within the meaning of the Act and thus are made "for the purpose of influencing an[] election for Federal office."  52 U.S.C. § 30101(8)(A)(i).  That assumption is equally apt here, where RFR seeks to provide something to a prospective candidate in order to induce and then to support his potential candidacy.

contact list to Governor DeSantis without compensation, it is a gift.  Not only is that result consistent with the term's ordinary meaning, it is the only one that is plausible in context. FECA's concern is the provision of benefits to candidates—*i.e.* the *giving of things* to candidates—in ways that might give rise to corruption or its appearance.  *Buckley*, 424 U.S. at 25–26.  The plain meaning of "gift" addresses precisely this concern.

The contact list is also a "[]thing of value" such that the giving (or "gift[ing]") of it makes it a contribution.  52 U.S.C. § 30101(8)(A)(i).  Something is a "thing of value"—it is "valuable"—if it has "financial or market value."  *Valuable*, Black's Law Dictionary, *supra*; *see also Value*, Black's Law Dictionary, *supra* (def. 2 "The monetary worth or price of something; the amount of goods, services, or money that something commands in an exchange"); *Valuable*, Webster's Third New International Dictionary (2d. ed. 1976) (def.1 "possessing monetary value in use or exchange"); *Value*, Webster's Third New International Dictionary (2d ed. 1976) (def. 2 "the monetary worth of something").  There is no dispute that RFR's contact list has considerable financial or market value.  RFR has spent over $1 million creating it, Dkt. 17 at 8, and by RFR's own estimate, its fair market value is greater than $11,000, Dkt. 23-2 at 4; Dkt. 25 at 33.

The reason RFR's contact list is so valuable—and this is in many ways the crux of the case—is that it is indistinguishable from a mailing list, a well-established "thing of value" the provision of which for less than its ordinary price constitutes a "contribution" under FECA.  As this Court recognized in *Federal Election Commission v. Christian Coalition*, 52 F. Supp. 2d 45 (D.D.C. 1999), "mailing lists have commercial value and are routinely rented for fundraising or other solicitation purposes."  *Id.* at 96; *see also FEC v. Int'l Funding Inst., Inc.*, 969 F.2d 1110, 1116 (D.C. Cir. 1992) (recognizing that lists of donors are "the product of time-consuming,

labor-intensive activities that can cost a political committee thousands, even millions, of dollars"
(internal quotation marks omitted)).  RFR understands this; RFR itself spent thousands of dollars
to rent mailing lists to use for soliciting signatories for its petition.  Dkt. 1 at 9 (Compl. ¶ 23);
Dkt. 23-2 at 18.  Any doubt regarding the status of mailing lists, moreover, is put soundly to rest
by an FEC regulation providing that "the provision of any goods or services," including, for
example, "membership lists[] and mailing lists," "without charge . . . is a contribution."  11
C.F.R. § 100.52(d)(1).  Notably, RFR does not challenge the reasonableness or constitutionality
of this regulation.

        In short, then, RFR seeks to give Governor DeSantis a valuable contact list, and its
purpose in doing so is to influence the 2024 election by inducing Governor DeSantis to become a
candidate in that election and supporting him in his candidacy.  Such a conveyance is a
contribution under 52 U.S.C. § 30101(8)(A)(i).

        RFR urges the Court to reject these commonsense interpretations of both "gift" and
"thing of value," but its reasons are unpersuasive.

        RFR first argues that whatever the word "gift" encompasses, it cannot include a petition,
because a petition is "[p]ure political speech."  Dkt. 8-1 at 23.  That contention rests on a faulty
premise.  Although the text of the petition and the list of associated names constitute core
political speech, the same cannot be said for the contact information.  RFR never explains why
"John Doe – john.doe@website.com" or "John Doe – (123) 867–5309" carry meaningful
expressive value above and beyond "John Doe."  And, as explained, the FEC has indicated that it
would not object to RFR presenting the petition without the associated contact information.  Dkt.
16 at 29; Dkt. 22 at 36, 39–40.  So the information that the FEC seeks to restrict is not core
political speech; it is contact information.

The notion that the presence of a significant speech component exempts an item from the ambit of "gift" and thus FECA more generally is also a non-sequitur.  Campaign finance regulation, in general, involves some regulation of political speech.  *Buckley*, 424 U.S. at 16.  But as the Supreme Court has held time and again, because "contributions lie closer to the edges than to the core of political expression," *FEC v. Beaumont*, 539 U.S. 146, 161 (2003), contribution limits—like those at play here—may permissibly be regulated, *see McCutcheon v. FEC*, 572 U.S. 185, 197 (2014).  RFR's contention that items with speech components are "not ordinarily characterized as [] 'gift[s]' and therefore do[] not constitute [] 'contribution[s],'" Dkt. 8-1 at 24, ignores the history of campaign finance regulation and dozens of opinions from the Supreme Court, the D.C. Circuit, and this Court that approve the regulation of speech in the form of campaign contributions.  RFR's construction also contradicts the plain language of FECA and the "cardinal principle of statutory construction" that a court must "give effect, if possible, to every clause and word of a statute."  *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (cleaned up).

Failing to make headway on plain meaning, RFR invokes other canons of construction, none of which sheds meaningful light on the interpretive questions presented here.  RFR first cites to the *noscitur a sociis* semantic canon—"a word is known by the company it keeps," *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008) (quoting *S.D. Warren Co. v. Maine Bd. Of Env't Prot.*, 547 U.S. 370, 378 (2006))—as a basis to read "gift" to exclude contact lists, at least if they are appended to "petitions."  It notes that the definition of contribution includes a list of terms in addition to "gift"—"subscription, loan, advance, or deposit," 52 U.S.C. § 30101(8)(A)(i)—and that each of these terms has some financial connotation.  Dkt. 8-1 at 25.  Applying the *noscitur* canon, then, RFR maintains that the Court should read the term "gift" to cover only "transfers with a financial aspect."  *Id.* at 24–25.  This argument does bring several

additional words of the statute into the picture, but, more importantly, it leaves critical ones out. In full, the provision says that the word "contribution includes . . . any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i). The disjunctive phrase "money *or anything of value*" lays plain that "contribution[s]," and thus "gift[s]," are not limited to money or other forms of currency or things with a defined transactional value. *Id.* (emphasis added); *see Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1141 (2018) (noting that "'or' is 'almost always disjunctive'" (quoting *United States v. Woods*, 571 U.S. 31, 45 (2013)). And, as recounted above, courts have long read the word "gift" to include in-kind contributions that do not have a "financial aspect" as RFR would narrowly define that concept. *Buckley*, 424 U.S. at 36–37 (discussing "food or beverages" and "travel" as types of in-kind contributions); *Campaign Legal Ctr.*, 31 F.4th at 784 (describing in-kind contributions to include "committee staff time, office space, or other resources").

Lest there be any doubt, the statute does not merely refer to "gift[s]" or "things of value" but rather "*any* gift" and "*any*thing of value." 52 U.S.C. § 30101(8)(A)(i) (emphasis added). "Any," whether used on its own or as part of another word, "has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting *Any*, Webster's Third New International Dictionary (2d ed. 1976)). Such broad language cannot plausibly be construed as limited to items with a transactional or "financial aspect." To conclude otherwise would deprive the Act's contribution limits of any practical meaning. Under RFR's reading of the statute, large contributors could easily evade the statutory limits by purchasing all of the supplies a campaign might need. RFR fails to explain, for example, whether or how its reading of the statute would preclude a contributor with sufficient

resources from buying an airplane (and all the necessary fuel) to allow the candidate to travel the country. Airplanes are not financial instruments, but they are certainly things of value.

RFR also looks for support in three substantive canons: constitutional avoidance, the major questions doctrine, and the rule of lenity. Taking these in order, the canon of constitutional avoidance applies only if one potential interpretation of a statute would raise "grave and doubtful constitutional questions." *Rust v. Sullivan*, 500 U.S. 173, 191 (1991) (quoting *United States ex rel. Att'y Gen. v. Del. & Hudson Co.*, 213 U.S. 366, 408 (1909)). As the Court explains in more detail below, the FEC's interpretations of "any gift" and "anything of value" do not give rise to any "grave" constitutional doubts, so the canon is inapplicable. Next, the major questions doctrine addresses those "'extraordinary cases' in which the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (alteration in original) (some internal quotation marks omitted) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000)). It applies in particular when such authority "lack[s] historical precedent," *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010) (internal quotation marks omitted), in the face of ambiguous statutory language, *see West Virginia*, 142 S. Ct. at 2608. Nothing like that is presented here. The authority the FEC asserts is no different than the authority it has always asserted and that the Courts have recognized and upheld since FECA's inception. *See Buckley*, 424 U.S. at 29, 36–37. "Any gift" and "anything of value" also reside in the definition of one of FECA's core provisions, hardly the sort of "cryptic" statutory language with which the major questions doctrine is most concerned. *West Virginia*, 142 S. Ct. at 2608 (quoting *Brown & Williamson Tobacco Corp.*, 529

U.S. at 160).  Lastly, the rule of lenity applies only where a statute presents a "grievous ambiguity." *Shaw v. United States*, 580 U.S. 63, 71 (2016) (quoting *Muscarello v. United States*, 524 U.S. 125, 138–39 (1998)).  For reasons already provided, the relevant statutory text is not ambiguous, much less grievously so.

To be sure, the FEC itself asserts that the definition of contribution is ambiguous, hence its invocation of *Chevron* deference.  But not all ambiguity is of the same stripe.  The Supreme Court made this point in a related context in *Buckley v. Valeo*, 424 U.S. 1 (1976), where it observed that any uncertainty regarding the meaning of the phrase "for the purpose of influencing" an election "presents fewer problems in connection with the definition of a contribution" than in other contexts, "because of the limiting connotation created by the general understanding of what constitutes a political contribution."  424 U.S. at 23 n.24.  This is just such a circumstance, where the provision of mailing lists and the like without charge has long been understood to qualify as an in-kind contribution.  *Christian Coalition*, 552 F. Supp. 2d at 96; *Int'l Funding Inst.*, 969 F.2d at 1116.  Moreover, the relevant inquiry—at *Chevron* step one and when applying other ambiguity-dependent interpretative canons—is not whether there lurks some ambiguity in a statutory provision when that provision is read in a void or is applied to circumstances not raised in the case.  *Brown & Williamson Tobacco Corp*., 529 U.S. at 132–33.  Rather, the question is whether a statutory term is ambiguous as to the particular application at issue.  *Calif. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 400 (D.C. Cir. 2004) ("The issue is not so much whether the word 'practice' is, in some abstract sense, ambiguous, but rather whether, read in context and using the traditional tools of statutory construction, the term 'practice' encompasses the procedures [that were challenged in the case].").  This is because "[t]he meaning—or ambiguity—of certain words or phrases may only become evident when

placed in context." *Brown & Williamson Tobacco Corp*., 529 U.S. at 131; *Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context."). The question here is thus whether FECA's definition of "contribution" is ambiguous as applied to RFR's contact list. It is not, and RFR cites to no precedent, dictionary, or alternative reading of the text that could plausibly support excluding mailing or contact lists from the statutory definition of in-kind contributions.

RFR next endeavors to distinguish its contact list from a mailing or contributor list. It emphasizes first that unlike a more typical mailing list, the item it proposes to provide also contains political speech, namely, the content of the petition and the names of the signatories. This boils down to the unsupportable submission that if expressive content it attached to a contact list, it is no longer a contact list. More generally, RFR's argument seems to be that if expression is added to a "thing of value," it becomes something other than a "thing of value." That contention does not pass the straight-face test. The hypothetical airplane described above is still an airplane (and still an in-kind contribution), even if the donor stencils a "petition" on the back of every seat. So too with contact lists. If it were otherwise, FECA would be a nullity; all contributions could become non-contributions so long as an expressive element is added.

*Buckley* famously held that "the dependence of a communication on the expenditure of money . . . [does not] introduce a nonspeech element [to the communication] or [] reduce the exacting scrutiny required by the First Amendment." *Id.* at 16. But the converse is also true: the combination of a speech element with an item of monetary value does not eliminate the monetary value of the latter nor the ability of the government to regulate it consistent with the First Amendment. *Cf. United States v. O'Brien*, 391 U.S. 367, 376 (1968) ("[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important

governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms."). This is particularly true where the core political speech (here, the petition itself) and the in-kind contribution are not unavoidably linked; RFR can provide Governor DeSantis with its "petition" without also providing him with its contact list.

It also bears mention that when given the opportunity to engage in the core political speech that it invokes here, while excluding the valuable contact list, RFR declined. In explaining its refusal to yield on this point, RFR contends that the inclusion of phone numbers and e-mail addresses is necessary to demonstrate to Governor DeSantis that the signatures are authentic. Dkt. 8-1 at 21; Dkt. 17 at 10, 28. That is a doubtful proposition, because it is no more difficult to make up phone numbers than it is to make up names and only slightly more work to generate fake e-mail addresses. Perhaps RFR envisions that Governor DeSantis or his staff will call or e-mail a random sample of signatories to make sure they are real. But if that is what RFR has in mind, it has offered no support for the assumption that its petition will carry greater First Amendment punch if it includes the contact information needed for such efforts. More importantly, however, even if RFR's justification was more plausible, it would not change the statutory analysis. That a petition is more resonant or verifiable if it includes a contact list does transform an in-kind contribution into unregulatable, core political speech. Applying RFR's reasoning, Governor DeSantis might be better able to assess whether the petition signatories are really committed to him—or whether, for example, they signed the petition in the hopes of inviting a primary fight that might weaken all of the Republican candidates—if each signatory also made a modest financial contribution to him. But that increased certainty regarding the *bona fides* of each signatory would not permit the FEC to ignore those contributions. The same is true of RFR's in-kind contribution of a contact list.

The proposition that a list of names, e-mail addresses, and phone numbers is a contact list (and the corollary that whatever else it might accompany cannot change that fact) dispenses with RFR's other arguments as well.  For instance, RFR asserts that its contact list is not a contact list because it "reflects the voluntary, affirmative political and expressive association of Governor DeSantis' supporters."  Dkt. 8-1 at 28.  But RFR fails to explain why this is so.  RFR also has it exactly backward as a practical matter.  One of the things that makes RFR's contact list so valuable is that, at substantial expense, RFR has identified those voters most likely to support Governor DeSantis' candidacy.  These are the individuals who, if contacted, will presumably be most likely to make contributions to his campaign, to volunteer, and to show up at the polls.  If any contact lists should be treated as in-kind contributions, surely those that are crafted to provide the most benefit to their recipients should be.  In any event, to sound a by-now-familiar note, the FEC has no quarrel with the "voluntary, affirmative political and expressive association" of RFR's signatories, only the provision of the valuable contact information that RFR collected at considerable expense and using, at least in part, soft money.  Dkt. 8-1 at 28; Dkt. 16 at 29; Dkt. 22 at 36, 39–40.

## B.

Changing tack, RFR attempts to reframe the issue: it argues that, if anything, RFR should be treated as a conduit for the contributions of the petition's signatories. The signatories are, after all, the ones who are providing their contact information, which RFR is merely passing along to Governor DeSantis.  Dkt. 8-1 at 30–36.  RFR then maintains that the contribution of each signatory—their name and contact information—should be considered *de minimis* and therefore should not count against their own contribution limits.  *Id.* at 31 n.2.  The Court is not convinced.

FECA recognizes the concept of conduits and conduit contributions, also known as "earmarked" contributions.  It provides:

> For purposes of the limitations imposed by this section, all contributions made by a person, either directly or indirectly, on behalf of a particular candidate, including contributions which are in any way earmarked or otherwise directed through an intermediary or conduit to such candidate, shall be treated as contributions from such person to such candidate.

52 U.S.C. § 30116(a)(8).  The FEC, in turn, has promulgated regulations that impose certain requirements on conduits, including (1) that conduit contributions must be forwarded to their ultimate recipient "no later than 10 days after receipt," 11 C.F.R. §§ 110.6(b)(2)(iii), 102.8(a), (c); (2) that a conduit must "report the original source" of the contribution to the FEC, *id.* § 110.6(c)(1)(i); and (3) that if the conduit exercises "any direction or control over the choice of recipient," the contribution shall be treated as one from the conduit as well as the original source, *id.* § 110.6(d)(2).

Here, the FEC concluded that RFR's contact list was not properly considered a series of individual contributions from each signatory because "the 'thing of value' that R[F]R proposes to provide to Governor DeSantis does not consist solely, or even primarily, of any individual signatory's name or contact information."  Dkt. 23-2 at 198.  "Instead," the FEC reasoned, "it lies in R[F]R's collection and compilation of information from tens of thousands, if not 'millions,' of individuals nationwide who would have already demonstrated their support for Governor DeSantis and his potential presidential campaign by participating in R[F]R's petition project—a project on which R[F]R plans to expend considerable resources of its own."  *Id.*  In other words, the FEC concluded that the whole of RFR's contact list amounts to more than the sum of its parts.  By conducting an expensive campaign of nationwide outreach and compiling the fruits of that outreach in a single, useable contact list of motivated supporters, RFR created a

"thing of value" beyond that which is attributable to the "contribution" of each individual petition signatory.

That determination was not only reasonable but unassailable.  It has taken RFR nearly a year of work, over $1 million, and considerable initiative to identify and to solicit the hundreds of thousands of signatories of its petition and to amalgamate their contact information into a contact list.  Dkt. 17 at 8; Dkt. 1 at 8–9 (Compl. ¶¶ 21, 23, 25).  Had RFR not expended that time and money, no such list would exist.  RFR's labor and expenditures have thus created a uniquely valuable asset, the value of which cannot be attributed to the individual signatories.

*Christian Coalition* endorsed this theory of value.  At issue in that case was a list of delegates from the 1993 Republican Convention in Virginia who had supported a particular candidate, Mike Farris, for Lieutenant Governor (the "Farris List").  52 F. Supp. 2d at 77.  The defendant, the Christian Coalition, had taken that list and cross-checked it against its own mailing list to determine which individuals were on both lists.  *Id.*  The court explained that "[t]he Farris list"—as augmented by the Christian Coalition's cross-check—"would be valuable to a [1994 Republican] campaign because those on the list were highly likely to share the Coalition's views on a number of issues . . . and many of the 1993 delegates would likely be delegates to the 1994 Virginia Republican convention."  *Id.*  Against this backdrop, the Court concluded that the Coalition's provision of the list free of charge to Oliver North's 1994 senate campaign constituted a "contribution."  *Id.* at 49, 96.  As the Court explained, "[e]ven if the names on the Farris list were publicly available, the fact that the Coalition expended resources to compile the list and cross-check it with the Coalition's house file, created value that was passed on to the North campaign."  *Id.* at 96.  Here, as in *Christian Coalition*, RFR has "expended resources to compile" the "Ready for Ron" contact list, and, in so doing, it has created an

28

independent "thing of value."  The FEC's determination that providing this "thing of value" to Governor DeSantis would constitute a contribution *from RFR* is consistent with precedent, makes eminent sense, and was not, by any stretch, arbitrary and capricious.

To be clear, the Court does not hold, as RFR seems to suggest, Dkt. 25 at 12–13, that were RFR to provide its contact list to Governor DeSantis, that would amount to an in-kind contribution of the full value of RFR's solicitation expenses—$1 million or more, Dkt. 17 at 8. The FEC has held that third-party expenditures soliciting contributions to a candidate do not count directly as contributions by the third party to the candidate, and the Court does not disturb that conclusion.  *WE LEAD*, FEC Advisory Op. 2003-23, at 5 (Nov. 7, 2003), https://saos.fec.gov/aodocs/2003-23.pdf; *see also* 52 U.S.C. § 30101(17) (defining independent expenditure).  Rather, the list as a whole has value—created by means of RFR's independent expenditures but distinct from those expenditures—that all agree exceeds FECA's contribution limits and that the FEC reasonably held is distinct from the value of each separate name and e-mail address or phone number.  That "thing of value" is what RFR seeks to contribute to Governor DeSantis.

RFR offers four arguments in support of its conduit theory, none of which is availing.

The first is that compiling a mailing list is no different than compiling financial contributions, so RFR is no different than a more typical contribution conduit.  Dkt. 8-1 at 32; Dkt. 25 at 19–21.  The FEC reasonably rejected this comparison.  The following hypothetical illustrates the difference between one who compiles and passes along monetary donations and one who does the same with contact list information.  Imagine an ordinary conduit who spends $20,000 soliciting contributions for a candidate, yielding contributions from 100 individuals of $100 each, which the conduit passes along to the candidate.  The $10,000 the conduit remits to

the candidate is worth $10,000 to the candidate—exactly the sum of the individual contributions.

And, as long as the candidate receives the $10,000, the risk of actual or apparent corruption is

minimal: a $100 contribution is worth $100 regardless of who collects it.  To be sure, by

physically collecting and passing along contributions, the conduit has saved the candidate some

logistical or administrative effort, but only a de minimis amount.  It requires little additional

effort for a candidate to accept 100 $100 payments versus one $10,000 payment, and conduits do

not themselves bear the transaction costs associated with the separate payments, which the

original contributor or the candidate must pay in any event.  *See ReCellular*, FEC Advisory Op.

2010-21, at 7–8 (Oct. 8, 2010), https://saos.fec.gov/aodocs/AO%202010-21.pdf.

A contact list is different.  To start, the contact information of an identified supporter is

far more valuable than the contact information of anyone else.  *See Christian Coalition*, 52 F.

Supp. 2d at 77, 96; *see also* Dkt. 17-1 at 4 (Llanes Decl. ¶ 11) (noting that the value of a person's

contact information depends in part on "the amount that is known about [the person's] political

beliefs, affiliations, or leanings" and "how reliably the [person] contribut[es] or otherwise

respond[s] to solicitations").  RFR has spent significant resources making sure it has a list only

of the former.  Moreover, much of the value of a contact list lies in the fact that someone has

engaged in the effort to compile the list in a useful manner.  If 200,000 individuals individually

sent their contact information through letters, e-mails, text messages, and phone calls to

Governor DeSantis, it would require considerable labor on his part to intake and organize that

information in a usable form.  RFR has done that work for him.  Indeed, RFR seems to recognize

just how onerous such an organizational effort is: it asks that, if it is treated as a conduit, it not be

subjected to conduit reporting requirements, in part because "listing potentially hundreds of

thousands" of contributions would be a "substantial burden" that is "unreasonable" and even

"unconstitutional."  Dkt. 8-1 at 31–32 n.2.  The FEC, accordingly, reasonably concluded that a compiled contact list of avowed supporters is different than a series of monetary contributions.

This same reasoning applies to RFR's second contention.  RFR notes that if each signatory independently sent their contact information directly to Governor DeSantis—even at RFR's prompting—the signatories would be treated as the source of the "contributions," not RFR.  Dkt. 8-1 at 32–33; Dkt. 25 at 16–17.  That is true but, for the reasons just provided, beside the point.  Through its efforts, RFR has created a campaign tool of distinct value.

Third, RFR argues that the FEC's advisory opinion in this case is inconsistent with prior opinions that blessed various conduit contribution arrangements.  But RFR has failed to identify a prior advisory opinion that is in actual conflict with the one at issue here.  It first cites to several opinions approving conduit contribution arrangements under which conduits would solicit contributions for identified candidates or potential candidates and remit those contributions to the candidates (or potential candidates when they declared their candidacies). *ActBlue*, FEC Advisory Op. 2006-30 (Nov. 9, 2006), https://www.fec.gov/files/legal/aos/2006-30/2006-30.pdf; *ActBlue*, FEC Advisory Op. 2007-27 (Dec. 17, 2007), https://saos.fec.gov/aodocs/2007-27.pdf; *ActBlue*, FEC Advisory Op. 2014-19 (Jan. 15, 2015), https://saos.fec.gov/aodocs/AO_2014-19_(ActBlue)_Final_(1.15.15).pdf; *Skimmerhat*, FEC Advisory Op. 2012-22 (Aug. 2, 2012), https://saos.fec.gov/aodocs/AO%202012-22.pdf; *WE LEAD*, FEC Advisory Op. 2003-23, *supra*.  Many, although not all, of these opinions concern ActBlue, a political committee and major contribution conduit.  But each of these opinions deals only with the remittance of money which, for the reasons discussed above, differs in material respects from the compilation of a contact list.  Notably, there is no suggestion in any of the opinions that the conduit was adding value to the contributions in a manner anything like what RFR proposes to

31

do.  Because these opinions dealt with a very different question from that raised here, they

neither compelled a result different from that which the FEC reached nor obligated the FEC to

offer a reasoned basis for departing from prior practice or precedent.  *See Hall v. McLaughlin*,

864 F.2d 868, 873 (D.C. Cir. 1989) ("[I]f the court itself finds the past decisions to involve

materially different situations, the agency's burden of explanation about any alleged 'departures'

is considerably less.").

RFR also highlights that in most of these opinions the FEC approved—indeed,

required—that each conduit provide to the recipients of contributions not only the funds

contributed but also the name and physical mailing address of the original contributor.  Dkt. 8-1

at 33–35.  This information, it maintains, is no different than that which it seeks to give to

Governor DeSantis.  *See id.*  But there is an essential difference: FEC regulations *require*

conduits to pass along the names and mailing addresses of contributors to the ultimate recipients

*in order to enforce the relevant contribution limits* and FECA's other prohibitions, 11 C.F.R.

§§ 110.6(c)(1)(iv), 102.8(a)–(b), whereas RFR seeks to provide Governor DeSantis with a

distinct thing of value in excess of those very contribution limits.  It goes without saying that a

conduit's compliance with a regulatory requirement is far less likely to give rise to an appearance

of corruption than is a political committee's effort to give a contact list to a candidate or

prospective candidate.  In the former scenario, the names and addresses are provided to prevent

the violation of FECA, while in the latter, the contact list serves no countervailing regulatory

purpose and is indistinguishable from the types of lists that the FEC has consistently treated as

in-kind contributions.  *See, e.g.*, *Ryan*, FEC Advisory Op. 2014-06, at 8 (July 24, 2014),

https://saos.fec.gov/aodocs/2014-06.pdf; *Brown*, FEC Advisory Op. 2011-02, at 7–8 (Feb. 17,

2011), https://saos.fec.gov/aodocs/AO%202011-02.pdf; *Dellums*, FEC Advisory Op. 1981-46, at

2 (Nov. 16, 1981), https://saos.fec.gov/aodocs/1981-46.pdf.  In the usual course, moreover,

conduits like ActBlue are generally required to provide contribution recipients with any conduit

contributions (and the required identifying information) within ten days of receiving them, 11

C.F.R. § 102.8(a), making it unlikely that the conduit could, in effect, provide the candidate with

a contact list under the guise of the regulatory identification requirements.[8]  And as noted above,

RFR acknowledges that *compiling* disparate contact information as it comes in is highly

burdensome.  Dkt. 8-1 at 31–32 n.2; Dkt. 25 at 38 n.6.

      In response, RFR notes that ActBlue *does* provide the e-mail addresses and phone

numbers of contributors to candidates free of charge when it remits those contributors' financial

contributions.  Dkt. 8-1 at 33–34.  But the permissibility of that practice has never been before

the FEC, and it has never approved it.  Dkt. 24 at 3.  There is at least a fair question whether that

practice is permissible under the RFR advisory opinion.  The legality *vel non* of ActBlue's

---

[8] In some prior opinions, including *ActBlue*, FEC Advisory Op. 2006-30, *supra*, at 1, and *WE LEAD*, Advisory Op. 2003-23, *supra*, at 4, the FEC arguably approved arrangements closer to that which RFR is proposing.  The *ActBlue* opinion, for instance, concluded that ActBlue could collect conduit contributions for potential candidates for the 2008 presidential election and postpone forwarding those contributions to the prospective candidates until 10 days after they formally registered.  *ActBlue*, FEC Advisory Op. 2006-30, *supra*, at 1.  Because ActBlue was required to include the mailing addresses of the contributors when it forwarded the monetary contributions, it was arguably permitted to provide contact information to candidates in bulk after they registered, rather than piecemeal as is typically the case.  Nevertheless, this advisory opinion (and the *WE LEAD* opinion, which approved a similar arrangement) remains distinguishable because of the fundamental difference between the compelled provision of certain contributor information that the FEC has concluded is necessary to enforce FECA's prohibitions and the gratuitous provision of additional contributor information for purposes unrelated to the enforcement of the Act.  More still, on the Court's reading of these advisory opinions, the FEC had no cause to and did not consider squarely whether the contact information at issue constituted a separate thing of value provided to the potential candidates, distinct from the monetary contributions that were the subject of the opinions.  So, although in a sense the FEC approved, in particular contexts, the bulk provision of contact information, it is more accurate to say that the FEC did not on its own initiative consider whether approving the monetary contribution scheme at issue created a separate potential problem.

activities, however, is not before the Court.  Instead, the Court may only consider—among RFR's other challenges—whether the FEC acted in an arbitrary and capricious manner by disapproving conduct by RFR that it has actually approved in other contexts.  Because the FEC has never approved ActBlue's provision of e-mail addresses and phone numbers to candidates, whatever ActBlue may (or may not) do in this regard has no bearing on the Court's decision.

In any event, these opinions are distinguishable in other ways as well.  Advisory Opinion 2006-30, for instance, the ActBlue advisory opinion most cited in subsequent opinions on these issues, emphasizes that ActBlue may serve as a conduit only if it adheres to conduit reporting requirements, most notably that it "report the original . . . source[]" of the contribution "to the Commission."  *ActBlue*, FEC Advisory Op. 2006-30, *supra*, at 6; 11 C.F.R. § 110.6(c)(1)(i).  The opinion even states that the FEC "consider[ed] the fact that ActBlue is a political committee *subject to the reporting requirements of the Act* to be significant to [its] determination" approving ActBlue's proposal.  *ActBlue*, FEC Advisory Op. 2006-30, *supra*, at 6 n.4 (emphasis added).  But RFR argues that, even if it is treated as a conduit, it should not be required to adhere to this requirement, because compliance would be unduly and even unconstitutionally burdensome on RFR and the signatories of the petition.  Dkt. 8-1 at 31–32 n.2; Dkt. 25 at 38–39 n.6.  RFR is, of course, correct that whether it is appropriately considered a conduit is an antecedent inquiry to whether it is entitled to an exemption from conduit reporting requirements, Dkt. 28 at 9–10, and the Court does not express a view on the latter issue, which is not before it and was not before the FEC.  But it is notable that RFR is not seeking to operate like any other

conduit committee.  Simply put, it wants the benefit of the ActBlue precedents without the

burden.[9]

 Finally, in its supplemental briefing, the FEC forthrightly surfaced two other advisory

opinions, at least one of which, *ReCellular*, arguably presents a closer analog to RFR's proposal

than do the precedents discussed above.  As an initial matter, the Court notes that RFR never

raised *ReCellular* before the FEC, so the Commission can hardly be faulted for failing to address

an argument that was never made or for failing to distinguish a precedent that RFR did not itself

consider sufficiently on point to raise before the agency.  Although an agency "cannot ignore its

own relevant precedent," *B B & L, Inc. v. NLRB*, 52 F.3d 366, 369 (D.C. Cir. 1995), it is "by no

means required to distinguish" every one of its prior decisions, *LeMoyne-Owen College v. NLRB*,

357 F.3d 55, 60 (D.C. Cir. 2004).  The D.C. Circuit has held, instead, that "where . . . a party

*makes a significant showing* that analogous cases have been decided differently, the agency must

do more than simply ignore that argument."  *Id.* at 61 (emphasis added).  A corollary of this

---

[9] The Court is likewise unmoved by RFR's contention that, even if it were a conduit passing along contact information to Governor DeSantis, treating the signatories' submission of contact information as non de minimis conduit contributions would be untenable, because it would "make it impossible for RFR or any other entity to actually compile a political petition."  Dkt. 25 at 18.  The reason, says RFR, is that it would have to "forward each signatory's name and contact information to Governor DeSantis within ten days of receiving it once [h]e becomes a candidate," rather than present all of the information at once at the time of its choosing.  *Id.*  But this assertion assumes that a political petition is only a political petition if it includes e-mail and phone information.  That assumption is baseless.  To state the obvious, petitions long pre-date modern modes of communication, and the advent of telecommunications technologies such as the cell phone and e-mail has not changed the essence of what makes something a petition. *Petition*, Oxford English Dictionary (3d ed. Dec. 2022), https://www.oed.com/view/Entry/ 141858 (def. 1 "A supplication, entreaty, or prayer"; def. 2 "A written or formal request"; def. 2.b "[A] formal written request or supplication, [especially] one signed by many people, appealing to an individual or group in authority . . . for some favour, right, or mercy, or in respect of a particular cause"); *Petition*, Merriam-Webster, https://www.merriam-webster.com/dictionary/petition (last visited Apr. 10, 2023) (def. 1.a "a formal written request made to an authority or organized body (such as a court)"; def. 1.b "a written request or call for change signed by many people in support of a shared cause or concern").

proposition is that if a party made no such showing before the agency—and the precedent is not so obviously on point that one would have expected the agency to consider the precedent on its own accord—the agency is not obligated to identify and to discuss it or every other relevant prior decision.  This is a variation of the more general rule that "parties seeking judicial review of agency action [must] raise their issues before the agency during the administrative process in order to preserve those issues for judicial review."  *Advocs. for Highway and Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1148 (D.C. Cir. 2005).

In any event, the fact pattern addressed in *ReCellular* has little bearing on RFR's proposed course of action.  In *ReCellular*, the FEC approved a plan under which ReCellular, a company that purchased used cell phones from individuals, would offer its customers the option of having the proceeds from the phones they sold to the company sent to political candidates and committees rather than remitted to them.  *ReCellular*, FEC Advisory Op. 2010-21, *supra*, at 1–2.  As part of each such transaction, ReCellular proposed to send e-mails to both the customer and to the recipient political committee confirming the contribution.  *Id.* at 3.  The e-mail to the political committee would also include the contact information of the contributor, including his or her e-mail address.  *Id.* at 5.  So *ReCellular*, unlike the other advisory opinions discussed above, approved the provision of contributor e-mail addresses to candidates.  *ReCellular*, however, differs from the FEC's *Ready for Ron* opinion in two significant respects.  First, the FEC held that ReCellular was required to charge either the recipients of contributions or the contributors themselves "for the cost of the notification e[-]mails."  *Id.* at 7.  As the agency explained, "[u]nder ReCellular's proposal, the cost of the notification e-mails would be the only cost borne by ReCellular," and it was—as the FEC understood the proposal—the only "service" or "[]thing of value" that ReCellular proposed to give to the candidates.  *Id.* (internal quotation

marks omitted).  As such, ReCellular was not permitted to bear that cost without becoming a contributor itself.  *Id.*  Here, in contrast, the FEC correctly concluded, based on years of precedent, that the contact list that RFR proposes to provide to Governor DeSantis is itself a "thing of value" and thus an in-kind contribution, and RFR's proposal does not contemplate RFR charging Governor DeSantis for providing it to him.

Second, and relatedly, the FEC required ReCellular to provide the contributor information to recipients on a contribution-by-contribution basis, "within ten days of confirming that the consumer's phone was worth the quoted price."  *Id.* at 8 (internal quotation marks omitted).  So, although ReCellular was permitted to provide candidates the component pieces of a contact list, it was not permitted to provide candidates with a mailing list or its functional equivalent.  That differs in material respects from what RFR proposes to give Governor DeSantis.  As the FEC interpreted the statute—correctly, in the Court's view—the "thing of value" that RFR aims to provide is the compilation of names of supporters accompanied by their contact information: a contact list.  And *ReCellular* says nothing about whether a contact list is a thing of value subject to FECA's contribution limits.

The other advisory opinion that the FEC references in its supplemental brief, *Democracy Engine*, FEC Advisory Op. 2022-03 (June 27, 2022), https://www.fec.gov/files/legal/aos/2022-03/2022-03.pdf, is even less on point.  In that case, a conduit contributor proposed to collect the e-mail addresses of contributors but stated only that, at the time it remitted contributions to their ultimate recipients, it "would provide the recipient[s] . . . with the information necessary to properly report the contribution to the Commission."  *Id.* at 3.  Only names and mailing addresses (and in some cases employer names) are "necessary to properly report" contributions to the FEC.  11 C.F.R. §§ 110.6(c)(1)(iv), 102.8(a)–(b).  So, *Democracy Engine* endorsed only

the type of information sharing that the FEC approved in its *ActBlue* opinions: that which is necessary to comply with regulatory requirements, and nothing more. For the reasons explained above, providing a candidate with information needed to *comply* with FECA's reporting requirements and contribution limits simply is not analogous to what RFR proposes to do.

The Court, accordingly, concludes that the FEC reasonably decided that RFR is not acting as a mere conduit for the contributions of others and that its decision is not inconsistent with any prior advisory opinions that either party has brought to the Court's attention.

## C.

It follows from the foregoing that RFR may not provide its contact list to Governor DeSantis free of charge—at any time. First and most obviously, if Governor DeSantis becomes a candidate for president, RFR may not give him the contact list for free. This is because: (1) the contact list constitutes a contribution under FECA; (2) that contribution would be from RFR, not the signatories of RFR's petition; (3) the market value of the contact list is greater than FECA permits; and (4) the contact list has been funded in part with soft money. For the same reasons, RFR may not provide the contact list to Governor DeSantis if he is testing the waters (setting aside for the moment RFR's challenge to the testing-the-waters regulation). As explained above, although the FEC's testing-the-waters regulation provides a limited exemption from FECA's disclosure requirements, it still requires that transfers comply with the Act's contribution limits. *See* 11 C.F.R § 100.72(a).

The last question—and the one on which the FEC was unable to reach a majority decision—is whether RFR may provide the contact list to Governor DeSantis before he begins testing the waters (if, in fact, he has not already begun to do so). In the Court's view, the premise of this question is confused, because FECA contemplates no scenario in which an

individual may accept contributions in excess of $5,000 (which RFR's contact list is) without either becoming a candidate or, under FEC regulations, testing the waters. The answer to this question is thus no different from the answer to the preceding questions: RFR may not provide its contact list to Governor DeSantis. The Court is unpersuaded by RFR's arguments to the contrary.

First a word on the standard of review. What standard the Court should apply in reviewing the FEC's failure to issue an advisory opinion for want of a majority is a difficult question. One possibility is that the Court should review a non-decision in the same way it reviews a decision on the merits: under the APA and with appropriate deference. *See Nat'l Rifle Ass'n of Am.*, 254 F.3d at 184–86. But the APA's arbitrary and capricious or contrary to law standard, 5 U.S.C. § 706(2)(A), and interpretive deference both seem an ill fit where, as here, the agency has reached no decision and has provided no reasoning to evaluate or interpretation to which to defer. Just as a court "cannot uphold silence," it cannot defer to it. *Cleveland Constr. Co. v. NLRB*, 44 F.3d 1010, 1016 (D.C. Cir. 1995). On the opposite end of the spectrum, one might by analogy apply the standard used to evaluate agency action unlawfully withheld. 5 U.S.C. § 706(1). After all, RFR contends that the FEC should have issued an advisory opinion approving RFR's proposed actions but declined to act. But this standard too is an ill fit: RFR has not actually brought a § 706(1) claim, and, when the FEC issues decisions contrary to a requester's position, courts do not apply the § 706(1) standard, even though the agency has also in some sense "withheld" the relief the requester sought. The Court also sees no reason why a more demanding standard of review should apply when the agency deadlocks than when it rejects the requester's position on the merits.

Given the absence of agency reasoning to review and mindful of the oddity of applying § 706(1) here, the Court concludes that the best course is to review de novo the legal question on which the FEC failed to issue an opinion.  In so doing, however, the Court must still defer, as appropriate, to *other* agency determinations and pronouncements—relevant regulations, prior advisory opinions, and the like.  Based on its de novo review, the Court concludes that, if Governor DeSantis were to accept RFR's contact list, he would become a candidate for federal office or would at least be testing the waters.[10]  Either way, providing the contact list to Governor DeSantis for free would constitute an excessive and thus unlawful contribution.

One might reasonably argue that anyone who accepts a contact list like RFR's—an item that meets the statutory definition of a contribution with a value over $5,000—necessarily becomes a candidate in all relevant respects.  That is, after all, what FECA says: a "candidate" is one who "seeks nomination for election, or election, to Federal office," and an individual "shall be deemed to seek nomination for election, or election . . . if such individual has received contributions aggregating in excess of $5,000."  52 U.S.C. § 30101(2)(A).  Under the statute, then, the default is that acceptance of a contribution greater than $5,000 equals a candidacy.  The only possibly applicable carve-out from FECA's plain language is the testing-the-waters exception.  And this exception might apply if Governor DeSantis accepts the contact list as part of an effort to "determin[e] whether [he] should become a candidate."  11 C.F.R. § 100.72(a).  In

---

[10] Of course, if RFR offered the petition to Governor DeSantis and he chose not to accept it, he would not thereby be testing the waters or become a candidate.  But the only sensible way to evaluate RFR's request is to assume that Governor DeSantis would accept what is offered.  To hold otherwise would deprive RFR of any possible access to the safe harbor, since RFR does not know (and has no reason to know) whether Governor DeSantis would accept the contact list, and thus RFR would send it to him at its peril.  And it would deprive Governor DeSantis of the ability to test the waters without the fanfare of a public campaign to require RFR to obtain a commitment from him of his intentions before requesting an advisory opinion or before seeking review in this Court.

analogous circumstances, the FEC has concluded, for example, that the "[r]ental and purchase of office equipment for the purpose of compiling the names and addresses of individuals who indicate an interest in organizing a national campaign" was a permissible testing-the-waters activity that would not make the recipient a candidate for all purposes. *See Askew,* FEC Advisory Op. 1981-32, at 2, 4 (Oct. 2, 1981), https://www.fec.gov/files/legal/aos/1981-32/1981-32.pdf. But whether accepting the contact list would make Governor DeSantis a candidate for all purposes or whether he would fall within the limited testing-the-waters "exemption," 11 C.F.R. § 100.72(a), the result is the same: FECA's contribution limits apply, and the value of the contact list exceeds those limits. There is therefore no scenario in which Governor DeSantis could accept the contact list without triggering FECA's limitations.

RFR's contrary position stems from a misunderstanding of the statute. RFR posits that there exists a sequential continuum of campaign phases: a pre-testing the waters period, in which someone can accept contributions from any source and without limitation; a testing the waters phase, in which someone can accept contributions subject to most of FECA's restrictions but exempt from its disclosure requirements; and a candidacy phase, in which FECA's full complement of restrictions attach. *See* Dkt. 8-1 at 52–54. But that view of campaign finance law finds no support in FECA, which sets forth a clear rule: a person is a candidate if he or she accepts more than $5,000 in contributions. 52 U.S.C. § 30101(2)(A). The only exception to this rule is found in the testing-the-waters regulation. 11 C.F.R. § 100.72(a). There is no third, regulation-free option for those who accept more than $5,000 in contributions. RFR's third option is not only atextual but also would open a gaping hole in the campaign finance laws and would render the balance struck in the testing-the-waters regulation meaningless. A "prospective" candidate would be free to accept contributions of any amount from any source by

the simple artifice of waiting to declare his or her candidacy or to invoke the testing-the-waters exception.  Avoiding that type of wholesale circumvention of the law is precisely why the FEC amended the testing-the-waters regulation in 1985 to subject "all funds received for 'testing the waters' . . . to the Act's limitations and prohibitions."  *Payments Received for Testing the Waters Activities*, 50 Fed. Reg. at 9994.

RFR protests that the mere acceptance of its contact list is insufficient to constitute testing the waters, Dkt. 8-1 at 53–54; Dkt. 17 at 12–13, and, it would seem to follow, insufficient to make someone a candidate.  Rather, RFR insists, testing the waters (and presumably a candidacy) requires "affirmative act[s]."  Dkt. 8-1 at 54.  But that contention is at odds with FECA, which repeatedly attaches legal consequences to the receipt of certain things.  For instance, the Act "deem[s]" anyone who receives "contributions aggregating in excess of $5,000" to be a "candidate," 52 U.S.C. § 30101(2)(A), makes it unlawful for any "candidate" to "receive . . . funds for any Federal election activity, unless the funds are subject to the limitations, prohibitions, and reporting requirements of th[e] Act," *id.* § 30125(e)(1)(A), and prohibits the "accept[ance] [] or recei[pt]" of a "contribution or donation" from a foreign national, *id.* § 30121(a)(2).  RFR's "affirmative acts" test appears nowhere in the statutory text or governing regulations and, if adopted, would open the floodgates to circumvention of the statutory requirements.

The Court thus has no difficulty concluding that Governor DeSantis would become a candidate or at least begin testing the waters were he to accept RFR's contact list.

### D.

RFR also attacks the testing-the-waters regulation as an impermissible interpretation of FECA and as inconsistent with the law in this circuit.  This is a puzzling argument coming from

RFR.  As explained above, the testing-the-waters regulation is a limited *exemption* from FECA's otherwise applicable disclosure requirements.  So, it is a mystery how RFR would benefit from a decision setting that exemption aside; if anything, it would mean that Governor DeSantis would qualify as a "candidate" for all statutory purposes were he to accept RFR's proposed in-kind contribution.

But, in any event, RFR's challenges to the testing-the-waters regulation are unavailing. RFR relies in large part on the D.C. Circuit's decision in *Federal Election Commission v. Machinists Non-Partisan Political League*, 655 F.2d 380 (D.C. Cir. 1981), which held that only organizations supporting or opposing a "candidate" are subject to regulation as political committees.  *Id.* at 393–94.  In *Machinists*, the FEC sought to exercise jurisdiction over certain "draft-Kennedy" groups—organizations formed to encourage Senator Edward Kennedy to run for president—after the Machinists Non-Partisan Political League allegedly made contributions to these groups in excess of FECA's contribution limits.  *Id.* at 383–84.  The D.C. Circuit held that the FEC could not permissibly do so.  *Id.* at 396.  As *Machinists* explains, in *Buckley* the Supreme Court interpreted FECA's definition of political committee to encompass only "organizations that are under the control of a *candidate* or the major purpose of which is the nomination or election of a *candidate*."  *Id.* at 391 (emphasis added) (quoting *Buckley*, 424 U.S. at 79).  And, *Machinists* points out, a committee seeking to draft a "candidate" for office necessarily is not "promoting a 'candidate' for office," because the individual it hopes to draft is not yet a candidate.  *Id.* at 392.  For these reasons, *Machinists* concludes that draft groups are not political committees and fall outside of the scope of the Act.  *Id.* at 396.

RFR reads *Machinists* to stand for the sweeping proposition that "FECA does not regulate efforts to 'draft' candidates for federal office," Dkt. 8-1 at 38, and argues that the

decision "establishes RFR's right to provide its signed petition to 'draft' Governor DeSantis at any[] time before he becomes a candidate," *id.* at 40.  But in pressing this point, RFR yet again ignores a crucial fact: if Governor DeSantis accepts RFR's contact list—an in-kind contribution worth more than $5,000—he *will become* a candidate for federal office, 52 U.S.C. § 30101(2)(A), unless he is deemed to be testing the waters, 11 C.F.R. § 100.72(a).  As the Court has explained, the testing-the-waters regulation does not regulate those who do not qualify as candidates; it *exempts* those who would otherwise be candidates from certain disclosure requirements.  *Id.*

*Machinists* casts no doubt on this straightforward reading of FECA.  The D.C. Circuit's decision dealt only with FECA's definition of "political committee" and expressed no view regarding the entirely distinct question of whether "an individual" who "receive[s]" an in-kind contribution worth more than $5,000 is properly "deemed" to be a "candidate" for purposes of the Act.  52 U.S.C. § 30101(2)(A).  *Machinists* speaks to the relationship between "political committees" and draft groups, the arguable vagueness of the statutory definition of "political committee," the way in which *Buckley* and other prior cases had interpreted "political committee," the constitutional doubts that a broad construction of "political committee" might engender, and the history of legislative action and inaction with respect to the treatment of draft groups as political committees.  *Machinists*, 655 F.2d at 391–96.  But it does not speak to the definition of "candidate."  Notably, although *Machinists* declined to adopt the most obvious (and expansive) reading of FECA's definition of "political committee," it merely quoted the definition of "candidate" without any suggestion that it should be similarly narrowed.  *Id.* at 392 n.24. Applying *Machinists* in the way RFR proposes would also make FECA circular: the statute would make the receipt of "contribution[s]" a trigger for becoming a "candidate," but it would

only treat the transfer of a thing of value as a "contribution" if it were provided to someone who was already a "candidate."

RFR's resort to the legislative history of FECA is no more availing.  As an initial matter, reliance on legislative history is unnecessary where statutory text is clear.  *See Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011).  And, although the statutory definition of "contribution" is arguably ambiguous, it is not ambiguous as relevant here.  FECA defines "contribution" as " any gift . . . of money or anything of value made by any person for the purpose of influencing any election for Federal office."  52 U.S.C. § 30101(8)(A)(i).  *Buckley* recognized that the phrase "for the purpose of influencing any election for federal office" admits of some ambiguity, 424 U.S. at 23 n.4, and the FEC asserts that it is this ambiguity that creates space for the testing-the-waters regulation, Dkt. 16 at 42–43.  The idea seems to be that if an individual spends money testing the waters and ultimately decides not further to pursue a candidacy, no harm and no foul.  No damage has been done to the anti-corruption interests FECA serves by allowing that individual to proceed anonymously.  And, because the funds expended on the abortive candidacy had at most a negligible "influenc[e] [on] any election for Federal office," the FEC deems them as not having been expended "for th[at] purpose."  52 U.S.C. § 30101(8)(A)(i).[11]  But this ambiguity has no bearing on the situation presented in this case.  RFR does not dispute that it wants to provide its petition and contact list to Governor DeSantis "for the purpose of influencing an[] election for Federal office," a sensible concession given the substance of the petition.  Dkt. 8-3 at 1.  The point it presses is more fundamental: it contends that FECA permits individuals to receive items provided "for the purpose of influencing any election for Federal

---

[11] If the individual *does* decide to run, the anti-corruption interest is still fully vindicated, because funds used for testing the waters must retroactively be reported.  11 C.F.R. § 100.72(a).

office" without restriction, if they have not yet declared a candidacy.  As explained, FECA

unambiguously forbids such a maneuver through the $5,000 trigger in its definition of

"candidate."  *See* 52 U.S.C. § 30101(2)(A).  Thus because the statute is unambiguous in *relevant*

*respects*, there is no reason to turn to legislative history, which is a tool for resolving ambiguity,

not creating it.  *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1749 (2020).

But even if the Court were to consider it, this legislative history provides no meaningful

support for RFR's contention.  It appears to pertain to efforts to bring contributions *to draft*

*committees* within the scope of the Act and does not address the regulation of contributions *from*

*draft committees* to individuals.  As *Machinists* recognized, the FEC had for years recommended

without success that contributions *to draft committees* be limited.  *Machinists*, 655 F.2d at 395–

96 (citing FEC annual report recommendations).  *Machinists* then held definitively that such

contributions were beyond the scope of the Act.  *Id.* at 391–96.  Some of the legislative history

RFR cites expressly involves post-*Machinists* efforts to abrogate that decision and to bring draft

groups within FECA.  *See* FEC, *Legislative Recommendations—1987*, at 2–3 (1987),

https://www.fec.gov/resources/cms-content/documents/legrec1987.pdf.

The remainder of the legislative history that RFR invokes involves failed attempts to

amend FECA's definition of "contribution" in the following manner:

(A) The term "contribution" includes—

(i) any gift, subscription, loan, advance, or deposit of money or anything of

value made by any person for the purpose of influencing any election for

Federal office; ~~or~~

(ii) the payment by any person of compensation for the personal services of

another person which are rendered to a political committee without charge

for any purpose~~.~~; and

(iii) any gift, subscription, loan, advance, or deposit of money or

> anything of value made by any person for the purpose of drafting a clearly
> identified individual as a candidate for Federal office or encouraging a
> clearly identified individual to become a candidate for Federal office.

*See, e.g.*, H.R. 708, 103rd Cong., § 8(a) (1993); S.7, 103rd Cong., § 422 (1993);  H.R. 4934, 102nd Cong., § 504(a) (1992); S.6, 102nd Cong., § 622(a) (1991); S.143, 102nd Cong., § 422(a) (1991); S.2595, 101st Cong., § 422(a) (1990); *see also* Dkt. 8-1 at 43–44 (citing similar proposed amendments).  These bills also proposed adding a clarification that a contribution made under the newly proposed sub-section shall be treated as a "contribution" to the recipient, "whether or not the [recipient] becomes a candidate."  *See, e.g.*, H.R. 708, § 8(b); S.2595, § 422(b); S.6, § 622(b).

      RFR urges the Court to infer that these proposed amendments reflect a congressional understanding that FECA's contribution limits do not currently apply to donations made for the purpose of influencing an individual to run for office.  But it is far from clear that the inference RFR would have the Court draw from the legislative history is the right one.  These proposed amendments could also be understood as further efforts to reverse *Machinists* and to regulate contributions to *draft committees* in the same way as contributions to "political committees."  Or perhaps these proposals failed because some legislators understood FECA in the way RFR does, but others disagreed and thought an amendment was unnecessary because the Act already covered the sort of transfers at issue.  Or perhaps some legislators understood the Act in the way the Court does yet sought to add additional clarity to "in Macbeth's words[,] . . . make assurances double sure."  *Am. Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1243 (D.C. Cir. 2020) (quoting *Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Human Servs.*, 830 F.3d 515, 520 (D.C. Cir. 2016)).  Or "[m]aybe still others, occupied by other concerns, didn't consider the issue at all."  *Bostock*, 140 S. Ct. at 1747.  There is no authoritative explanation for the proposed

amendments and why they failed to become law, so it is impossible to know.  The only thing the Court can conclude from this uncertainty is that the Supreme Court was correct to caution that "speculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt."  *Bostock*, 140 S. Ct. at 1747 (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990)).

Beyond *Machinists* and legislative history, RFR makes one further argument relating to the testing-the-waters regulation: it points out that the regulation says that "[f]unds received solely for the purpose of determining whether an individual should become a candidate are not contributions," yet it goes on to state that "[o]nly funds permissible under the Act may be used for such activities."  11 C.F.R. § 100.72(a); Dkt. 8-1 at 44–45.  How, RFR asks, can funds that are not a "contribution" be limited by the Act's other requirements, which pertain only to contributions?  RFR may be right that this is clumsy drafting.  But that does not change the result here.  RFR can hardly claim that the testing-the-waters regulation is invalid and then turn around and say that, because of the testing-the-waters regulation's exemption from the definition of contribution, testing the waters funds are not subject to FECA's contribution limits.  Either the concept of testing the waters is permissible under the statute or it is not.  Which leads to a more basic point: if the Court were to set aside the testing-the-waters regulation, RFR would be no closer to the relief that it seeks.  If there were no testing-the-waters exemption, that would mean that Governor DeSantis would automatically become a candidate if he accepted the contact list, and the contact list would still constitute an improper contribution under the statute.  52 U.S.C. § 30116(a)(1)(A).  Thus, to the extent that there are problems with how the regulation is cast, that does not help RFR.

RFR's final argument that the testing-the-waters regulation does not cover in-kind contributions because it speaks only of "[f]unds" suffers from the same defect.  11 C.F.R. § 100.72(a).  If RFR were to prevail on that argument, the exception would not apply, and thus any prospective candidate who accepts an in-kind contribution worth more than $5,000 would, by virtue of the statute, become a candidate.  So, regardless of whether the regulation covers in-kind contributions, RFR cannot provide its contact list to Governor DeSantis.

### E.

The final question is whether RFR is entitled to a preliminary injunction on its First Amendment challenges to the advisory opinion and FECA's contribution limits.  Once the nature of its proposed conduct is understood, RFR's arguments reduce to the contention that the First Amendment does not permit the FEC to treat a contact list as a contribution, so long as a "petition" is attached.[12]  Because this argument is unlikely to succeed on the merits and RFR's arguments with respect to the other preliminary injunction factors all rise and fall with the merits, the Court will deny RFR's request for a preliminary injunction.  *Green*, 54 F.4th at 747.

### 1.

To begin, the "closely drawn" standard of First Amendment scrutiny applies to RFR's as-applied challenge to FECA's contribution limits and the application of those limits in the advisory opinion.  *McCutcheon*, 572 U.S. at 197 (quoting *Buckley*, 424 U.S. at 25).  "Under that standard, '[e]ven a significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means *closely*

---

[12] Notwithstanding its challenge to the testing-the-waters regulation as a statutory matter, the Court does not understand RFR to bring a First Amendment challenge to FECA's definition of "candidate" as one who receives more than $5,000 in contributions.  Rather, it focuses its fire on whether the petition can be treated as a "contribution."

*drawn* to avoid unnecessary abridgment of associational freedoms.'" *Id.* (alteration in original) (emphasis added) (quoting *Buckley*, 424 U.S. at 25). The closely drawn standard is less demanding than strict scrutiny but is nevertheless a "rigorous standard of review. *Id.* (quoting *Buckley*, 424 U.S. at 29). Courts have applied the "closely drawn" standard to many different forms of contribution limits, recognizing that "[t]o protect contributors' heterogeneous First Amendment interests in making political donations, . . . the [Supreme] Court has announced a single unified test that applies an intermediate level of scrutiny to contribution limits." *Libertarian Nat'l Comm., Inc. v. FEC*, 924 F.3d 533, 541 (D.C. Cir. 2019).[13]

RFR offers three arguments for why the Court should nevertheless apply strict scrutiny here, none of which is convincing.

*First*, RFR contends that the Court should apply strict scrutiny because RFR's proposed contribution "is, itself, political speech," namely, a "signed political petition." Dkt. 8-1 at 19. The Court does not agree, because in fact the FEC seeks to apply FECA's contribution limits only to a contact list, not a petition. Dkt. 16 at 29; Dkt. 22 at 37, 39–40. "[T]he level of [First Amendment] scrutiny is based on the importance of the 'political activity at issue' to effective speech or political association," *Beaumont*, 539 U.S. at 161 (quoting *FEC v. Mass Citizens for Life, Inc.*, 479 U.S. 238, 259 (1986)), and the contact list—as distinct from the petition—only indirectly or marginally implicates core First Amendment values. Although like all political

---

[13] *See, e.g.*, *McCutcheon*, 572 U.S. at 199–227 (aggregate contribution limits); *Randall v. Sorrell*, 548 U.S. 230, 246–63 (2006) (plurality opinion) (state contribution limits); *McConnell*, 540 U.S. at 231–32 (2003) (ban on contributions by minors); *FEC v. Beaumont*, 539 U.S. 146, 161–63 (2003) (ban on corporate contributions); *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 456–65 (2001) (limits on party expenditures that are coordinated with candidates); *SpeechNow.org v. FEC*, 599 F.3d 686, 692 (D.C. Cir. 2010) (en banc) (contribution limits as applied to unincorporated nonprofit); *Wagner v. FEC*, 793 F.3d 1, 5–8 (D.C. Cir. 2015) (en banc) (prohibition on government contractor contributions).

contributions, monetary and in-kind, there is some expressive element to providing a candidate (or potential candidate) with a contact list, a restriction on the provision of e-mail addresses and phone numbers "entails only a marginal restriction upon the contributor's ability to engage in free communication." *Buckley*, 424 U.S. at 20.  RFR is still free to provide Governor DeSantis with its petition, and that petition would still demonstrate the depth of support for Governor DeSantis through its list of names.  The challenged limitation thus "involves little direct restraint on . . . political communication" and does not "in any way infringe" on RFR's ability to "discuss candidates and issues" or the ability of the petition's signatories to do the same.  *Id.* at 21.

*Second*, RFR maintains that its contact list has independent expressive value so significant as to justify the application of strict scrutiny.  Dkt. 25 at 26–29.  But the cases RFR cites for this proposition deal with restrictions on the *publication* of contact information, not the provision of an in-kind campaign contribution.[14]  That distinction matters.  As the FEC acknowledged at oral argument, "it would alleviate a lot of [the FEC's] concerns if the list that Ready for Ron wants to provide were just published online, and Governor DeSantis, along with other people, were able to look at that list and contact who they wanted to."  Dkt. 22 at 38–39.  In the same vein, RFR argues that a petition without a contact list would be less informative and thus less useful to Governor DeSantis because he could not employ the contact information to verify and contact signatories.  Dkt. 25 at 26–27, 28–29.  True, but as explained above, even if Governor DeSantis wanted to use the contact information for this purpose, the list would still constitute a thing of value, and the same rationale that supports other contribution limits would

---

[14] *See, e.g.*, *Brayshaw v. City of Tallahassee*, 709 F. Supp. 2d 1244, 1247, 1249 (N.D. Fla. 2010); *Sheehan v. Gregoire*, 272 F. Supp. 2d 1135, 1139, 1150 (W.D. Wash. 2003); *Ostergren v. Cuccinelli*, 615 F.3d 263, 271 n.8, 272 (4th Cir. 2010); *Publius v. Boyer-Vine*, 237 F. Supp. 3d 997, 1004 (E.D. Cal. 2017); *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 417, 419–20 (1971).

apply here with equal force.  RFR next insists that by limiting RFR's ability to share its contact list with Governor DeSantis, the FEC is requiring the signatories of RFR's petition to be "anonym[ous]," which would "alter or dilute" the petition's message.  Dkt. 8-1 at 21.  This too is incorrect.  The FEC does not object to the provision of the petition inclusive of the names of its signatories.  Dkt. 16 at 29; Dkt. 22 at 37, 39–40.  Despite the ubiquity of electronic communication, it can hardly be said that someone is "anonymous" if their name does not include the most convenient way to reach them.  Nor is the Court persuaded that the message of RFR's petition would be altered or diluted if it could not provide its contact list along with its petition.  RFR's expression of support does not turn on ten digits of a phone number or an e-mail address, and none of the cases RFR cites are to the contrary.

*Third*, RFR argues that strict scrutiny should apply because the application of FECA to its contact list is a content-based restriction.  It notes that the FEC only seeks to regulate its provision of the contact list to Governor DeSantis because RFR wants to provide with him the list "for the purpose of influencing an[] election for Federal office."  Dkt. 25 at 30 (quoting 52 U.S.C. § 30101(8)(A)(i)).  This, RFR contends, is a content-based regulation subject to strict scrutiny.  *Id.* at 30–32.  But that argument proves far too much.  All regulation of campaign contributions is content based in the sense that it targets only contributions made for the purpose of influencing elections for Federal office, not all transfers of money or things of value at any time for any reason.  Yet *Buckley* held and the Supreme Court has many times affirmed that strict scrutiny does not apply to contribution limits.  *See supra*, at 50 n.13.  RFR offers no persuasive reason why the same principles should not apply here.

2.

Under the "closely drawn" standard, the Court must first "determine whether the government has advanced a sufficiently important interest in support of" the application of FECA's contribution limits to RFR's mailing list.  *Wagner v. FEC*, 793 F.3d 1, 8 (D.C. Cir. 2015) (en banc) (internal quotation marks omitted).  The FEC asserts an interest in "preventing *quid pro quo* corruption [and] its appearance."  Dkt. 16 at 26 (quoting *McCutcheon*, 572 U.S. at 199).  It is, of course, well-established that "'the Government's interest in preventing *quid pro quo* corruption and its appearance is sufficiently important' to justify the regulation of campaign contributions."  *Wagner*, 793 F.3d at 8 (cleaned up) (quoting *McCutcheon*, 572 U.S. at 199). Indeed, the Supreme Court has gone further, calling the interest "compelling" and sufficient to "satisfy even strict scrutiny."  *McCutcheon*, 572 U.S. at 199 (internal quotation marks omitted). This is all for good reason: *quid pro quo* corruption subverts "the integrity of our system of representative democracy," and "the appearance of corruption" undermines "confidence in the system of representative Government."  *Buckley*, 424 U.S. at 26–27 (internal quotation marks omitted).

3.

The Court next concludes that the FEC is likely to demonstrate on the merits that applying FECA's contribution limits to RFR's proposed activity furthers the government's interest in preventing *quid pro quo* corruption and its appearance.  This follows from three settled propositions.

First, as noted above, contribution limits in general further the interest in combatting *quid pro quo* corruption and its appearance.  *Buckley*, 424 U.S. at 25–30.  As such, "Congress was surely entitled to conclude . . . that contribution ceilings were a necessary legislative concomitant

[to disclosure requirements] to deal with the reality or appearance of corruption inherent in a system permitting unlimited financial contributions." *Id.* at 28; *id.* ("The Act's . . . contribution limitation focuses precisely on the problem of large campaign contributions—the narrow aspect of political association where the actuality and potential for corruption have been identified . . . ."); *see also McConnell*, 540 U.S. at 136 ("Our treatment of contribution restrictions . . . reflects the importance of the interests that underlie contribution limits—interests in preventing 'both the actual corruption threatened by large financial contributions and the eroding of public confidence in the electoral process through the appearance of corruption.'" (quoting *FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 208 (1982))).

Second, "the provision of in-kind assistance" can "provide[] material financial assistance to a candidate" such that "the ultimate effect is the same as if the person had contributed the dollar amount [of the in-kind assistance] to the candidate." *Buckley*, 424 U.S. at 36–37.  Thus contribution limits further the government's anti-corruption interest even when applied to in-kind assistance.

Finally, as discussed above, a contact list is a form of in-kind contribution that is typically of significant value to a candidate.  *See Christian Coalition*, 552 F. Supp. 2d at 96; *Int'l Funding Institute*, 969 F.2d at 1116.  Indeed, in upholding FECA's contribution limits *Buckley* noted that, among other things, "sophisticated mass-mailing . . . operations" were one of the reasons that "raising large sums of money" was "an ever more essential ingredient of an effective candidacy."  424 U.S. at 26.  And if limitations on providing money to fund mass mailings further Congress's anti-corruption interest, surely providing mailing lists directly does so as well.

RFR questions this rationale, arguing that the risk of corruption in this context is minimal because compiling a contact list for a candidate would be a "terrible way of attempting to make

an excessive in-kind contribution" and thus an ineffective instrument for corruption.   Dkt. 25 at 32–33.  It notes that it has spent over $1 million to create its contact list, but, based on its own estimates as of March 14, 2023, the list is worth approximately $11,250.  *Id.* at 33.  This, RFR says, would be an "extraordinarily poor investment" if the goal was to funnel value to a candidate in return for improper favors once the candidate takes office.  *Id.*  It purports to find support for this argument in *McCutcheon*, which invalidated aggregate contribution limits in part because the scenarios in which exceeding such limits would give rise to apparent or actual corruption were implausibly uneconomic for the would-be contributor.  *See* 572 U.S. at 212–14. The Court rejects this argument for several reasons.

In the first place, whatever might be true of the market value of RFR's contact list, it is unlikely that the poor economic returns RFR describes are true of contact lists in general.  There would be little market for selling contact lists if doing so was financial folly, and RFR's own activities demonstrate that such a market exists.  Dkt. 1 at 9 (Compl. ¶ 23) (noting that RFR has rented mailing lists for its own use); Dkt. 23-2 at 18 (stating that RFR has spent thousands of dollars renting a contact list).  The caselaw also recognizes that campaigns spend enormous sums on such lists, not the comparative pittance that RFR contends that its list is worth.  *See, e.g.*, *Christian Coalition*, 552 F. Supp. 2d at 96; *Int'l Funding Inst.*, 969 F.2d at 1116; *cf. Buckley*, 424 U.S. at 26.  In any event, even if, as RFR claims, it has engaged in "[r]idiculously [i]nefficient" spending, Dkt. 25 at 32, that does not undermine the justification for applying FECA's contribution limits to contact lists in general, *cf. Buckley*, 424 U.S. at 29–30 (recognizing that "most large contributors do not seek improper influence over a candidate's position or an officeholder's action" but nevertheless upholding contribution limits).

55

Nor does Congress's anti-corruption interest turn on the savvy of the contributor. Assuming that RFR is correct about the market value of its contact list, the number of signatures it has amassed—one of the primary determinants of its value, Dkt. 17-1 at 4 (Llanes Decl. ¶ 11)—is a function of RFR's outreach strategy.  It may have been possible using different methods to generate an asset of considerably greater or lesser value for the same cost that RFR has incurred.  Similarly, the return on a political committee's expenditures in creating a contact list depends on the public's reaction to the message promoted.  There may be candidates for whom the same amount of outreach would have generated many more or many fewer signatures and thus a mailing list of greater or lesser value.  It would make little sense—and it would raise far more serious constitutional difficulties—for the First Amendment analysis to vary with the popularity of a candidate or political message.  Yet that is a consequence of RFR's position. Putting contact lists aside, there are innumerable things of value that can be purchased or created for a candidate, some with more substantial returns than others.  The Court is unpersuaded that the risk of apparent or actual *quid pro quo* corruption turns on the Court's assessment of the economic wisdom of an investment.

*McCutcheon* does not suggest otherwise.  It considered whether aggregate contribution limits (limits on the total amount a donor may contribute to all candidates) served the government's interest in preventing circumvention of base contribution limits (limits on the amount a donor may contribute to a single candidate—what RFR challenges here).  572 U.S. at 210–15.  It held that they did not, because base limits and other associated rules and regulations are sufficiently comprehensive that efforts to avoid base limits by funneling many individual contributions through different entities back to a single candidate are unlikely to be worth the candle, even absent aggregate contribution limitations.  *Id.* at 213–14.  *McCutcheon*'s argument

from impracticality was aimed at the possible circumvention of base limits, and its reasoning does not translate to the direct violation of those limits that RFR asks the Court to permit. Far from casting doubt on any application of base limits, *McCutcheon* reaffirmed that they are "the primary means of regulating campaign contributions" and the bulwark against corruption that made aggregate limits unnecessary. *Id.* at 209.

4.

Finally, the Court holds that the FEC is likely to prevail on its contention that applying FECA's contribution limits to RFR's contact list is "closely drawn to avoid unnecessary abridgement of associational freedoms." *Id.* at 218 (quoting *Buckley*, 424 U.S. at 25). Under the "closely drawn" standard, the government need not demonstrate a perfect fit between its interest and its proposed means of addressing that interest but rather one that is "reasonable." *Id.* (quoting *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989)). The "means" need not represent "the single best disposition," but it must be "narrowly tailored to achieve the desired objective." *Id.* (quoting *Fox*, 492 U.S. at 480).

The FEC is likely to establish that treating RFR's contact list as a contribution in excess of the contribution limits is a narrowly tailored means of preventing actual or apparent *quid pro quo* corruption. This limited restriction "leaves untouched" RFR's ability to circulate its petition, to spend unlimited amounts of hard and soft money soliciting signatures for it, and to present it to Governor DeSantis. *Wagner*, 793 F.3d at 25. It also permits any individual who determines that they are Ready for Ron to sign the petition and to have that signature be provided to the Governor. And it allows RFR to collect contact information so that it can itself validate the signatures and ensure that it is only presenting Governor DeSantis with the names of authentic supporters. The FEC's advisory opinion thus places no serious burden on anyone's

ability to express their support for Governor DeSantis and to join together with others in so doing. All it prevents is RFR from providing to Governor DeSantis free of charge a classic campaign asset that cost it over $1 million to compile.

RFR offers only one argument in response: It contends that the limitation the FEC seeks to apply is fatally underinclusive because it leaves RFR so many other options. Dkt. 25 at 34. In particular, it notes that at oral argument the FEC suggested that it might be permissible for RFR to post its petition—contact information and all—on a public website, such that Governor DeSantis or anyone else could review it. *Id.* As RFR sees it, this argument "give[s] away the ballgame" because the purported risk of corruption is no less if it posts its petition and contact list on the internet than if it provides it directly to Governor DeSantis. *Id.*

This argument fails for four reasons. First, a passing comment at oral argument does not suffice to bind the Commission to a theoretical course of action it has yet squarely to consider, nor does it undermine the validity of the Commission's opinion on matters on which it has formally opined. Second, underinclusivity is problematic in the First Amendment context only to the extent that it "raise[s] 'doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint,'" or "reveal[s] that a law does not actually advance a compelling interest." *Williams-Yulee v. Fl. Bar*, 575 U.S. 433, 448–49 (2015) (quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011)). RFR does not even suggest that the FEC's true interest was to disfavor its speech, and its contention that one attorney's comment proves that treating its contact list as an excessive contribution does not actually advance the government's anticorruption interest is weak. For all the reasons already provided, applying FECA to contact lists does advance this interest, even if "imperfectly." *Wagner*, 793 F.3d at 28. Third, and relatedly, the Court disagrees with RFR that there is no

relevant difference between posting a contact list on the internet and providing it to Governor DeSantis. *Quid pro quo* corruption is "a direct exchange of an official act for [a contribution]." *McCutcheon*, 572 U.S. at 192. If RFR does not "direct[ly] exchange" anything of value with Governor DeSantis by giving him a contact list, the risk of actual or apparent *quid pro quo* corruption is diminished. At the very least, the appearance of corruption is less if RFR does not provide its contact list to Governor DeSantis directly.

Finally, the line that RFR deems insignificant also resembles perhaps the most fundamental line in campaign finance law: the one between contributions and independent expenditures. Whereas *Buckley* upheld contribution limits as a permissible means of combatting corruption, 424 U.S. at 29, it reached the opposite conclusion with respect to independent expenditures, *id.* at 45. The Court reasoned that "[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate." *Id.* at 47. The same logic supports the distinction the FEC has suggested that it *might* draw between a "prearrange[d] and coordinat[ed]" transfer of a contact list to Governor DeSantis and the making of the entire list available to the public. *Id.*

\* \* \*

The Court "ha[s] little left to say because '[i]n First Amendment cases, the likelihood of success will often be the determinative factor in the preliminary injunction analysis.'" *Green*, 54 F.4th at 747 (second alteration in original) (quoting *Pursuing America's Greatness*, 831 F.3d at 511). "That is especially true here," because RFR's arguments on the remaining preliminary injunction factors "rest entirely on [its] flawed claim" that the FEC's advisory opinion and the

application of FECA's contribution limits to its proposed course of action "imperils [its] First Amendment rights." *Id.*

## CONCLUSION

For these reasons, it is hereby **ORDERED** that RFR's motion for a preliminary injunction, which the Court treats in part as one for summary judgment, Dkt. 8, is **DENIED**.[15]

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  May 17, 2023

---

[15] It is **ORDERED** that both RFR's consent motion to strike declaration, Dkt. 18, and motion to file supplemental declaration, Dkt. 19, are **GRANTED**.